848 So.2d 559 (2003)
Barbara HALL, et ux.
v.
BROOKSHIRE BROTHERS, LTD., Louisiana Patient's Compensation Fund.
Nos. 2002-C-2404, 2002-C-2421.
Supreme Court of Louisiana.
June 27, 2003.
*560 Christopher L. Edwards, Patrick R. Jackson, Counsel for Applicant (No. 2002-C-2404).
Van Clifton Seneca, Michele S. Caballero, Lake Charles, Thomas P. LeBlanc, Michael K. Prudhomme, Counsel for Respondent (No. 2002-C-2404).
Van Clifton Seneca, Michele S. Caballero, Lake Charles, Thomas P. LeBlanc, Michael K. Prudhomme, Counsel for Applicant (No. 2002-C-2421).
Christopher L. Edwards, Patrick R. Jackson, Counsel for Respondent (No. 2002-C-2421).
WEIMER, Justice.
In this medical malpractice action in which the plaintiff sued for damages resulting from ototoxicity caused by the prescription drug Gentamicin, a settlement was reached with the health care provider who prescribed the drug and with the pharmacist who overfilled the prescription. At trial against the Patient's Compensation *561 Fund, the jury awarded total damages of $5,744,920.43 and found the health care provider 85% at fault, the pharmacist 10% at fault, and the plaintiff 5% at fault. The judgment, after being reduced to comply with recovery limits under the Medical Malpractice Act, was for the full sum of $429,963.72, together with legal interest. The judgment also recognized the plaintiff as a patient in need of future medical care and related benefits in accordance with LSA-R.S. 40:1299.43.
We granted certiorari primarily to resolve three issues: (1) the propriety of quantifying victim and third-party fault in suits against the Fund when the health care provider has admitted liability by tendering the payment of $100,000.00; (2) the proper method for calculating the percentage reduction for comparative fault when the award of damages in a malpractice action exceeds the statutory cap; and (3) the accrual of legal interest on the amounts awarded by the jury. Finding no error in the court of appeal's resolution of these issues, we affirm the judgment below in its entirety.

FACTS AND PROCEDURAL HISTORY
For fifteen months, beginning in March 1994, plaintiff Barbara Hall suffered from an infection that manifested itself through the developments of boils over differing parts of her body. She sought treatment at various emergency rooms and from various doctors, not only for the boils, but also for the medical concerns associated with them. Each time she sought treatment, the treating physician would lance and drain the boil, and administer a course of antibiotics. This treatment proved to be unsuccessful in that the boils continued to recur.
On June 26, 1995, Mrs. Hall consulted Dr. Kent Seale at the Sulphur Surgical Clinic. Mrs. Hall had an active abscess on her right arm. When Dr. Seale recommended the usual course of treatment incising and draining the abscess and administering oral antibioticsMrs. Hall explained that because of her limited success with this method of treatment in the past, she did not wish to pursue this treatment again. Dr. Seale suggested that IV antibiotics would be an effective alternative therapy.
The next day, on June 27, 1995, Mrs. Hall reported to West Calcasieu Cameron Hospital, where the Clinic's Dr. Walter Ledet drained the boil. He gathered a specimen and ordered routine cultures and susceptibility studies. The pathology report revealed a staphylococcus aureus infection, which could be successfully treated with the use of any one of twenty antibiotics, including Gentamicin. Mrs. Hall signed a surgical consent form, after which Dr. Ledet inserted a subclavian catheter into her chest. A dose of 240 mg of Gentamicin was administered at that time.
On June 28, 1995, Mrs. Hall returned to the Sulphur Surgical Clinic to receive a second dose of Gentamicin. At that time, Dr. Seale issued a prescription for 240 mg of Gentamicin to be self-administered by Mrs. Hall once daily for three weeks. Weekly BUN (blood urea nitrogen) and creatinine tests were ordered and Mrs. Hall was instructed to return for a follow-up.
That same day, Mrs. Hall took the prescription to Brookshire Brothers to have it filled. Because Mr. Allen Vines, the pharmacist, had no Gentamicin in stock, he asked Mrs. Hall to return the following day. When she returned, Mr. Vines overfilled her prescription, giving her 8,000 mg of Gentamicin, when the prescription called for 5,040 mg (individual doses of 240 mg to be administered over a period of 21 days). In addition, Mr. Vines allegedly *562 failed to provide Mrs. Hall with drug information sheets or oral instructions relative to Gentamicin.
From June 29 until July 6, 1995, Mrs. Hall administered Gentamicin to herself through the subclavian catheter. On July 7, a specimen was collected for BUN and creatinine analysis. Both were normal, and the eleventh dose of Gentamicin was administered on that date. Thereafter, from July 8 to July 18, 1995, Mrs. Hall continued to self-administer the daily doses. The BUN and creatinine analyses of July 18 were normal once again. Though the treatment should have ended on the 18th, Mrs. Hall administered approximately seven additional doses of Gentamicin to herself from July 19 to July 25, 1995.
On July 25, Mrs. Hall contacted the Sulphur Surgical Clinic to report that she had been experiencing dizziness for three or four days and to ask whether her medication was somehow linked to that dizziness. Dr. Ledet advised Mrs. Hall to discontinue the Gentamicin and to come in for an exam. Mrs. Hall saw Dr. Ledet the next day. He discontinued the Gentamicin, but continued Bactroban and Duricef. Dr. Ledet removed the subclavian catheter and advised Mrs. Hall to return in one month.
On August 4, Mrs. Hall called the Clinic to report that she felt no better. Three days later, on a referral from Dr. Ledet, Mrs. Hall saw Dr. R. Mark Williams, an ear, nose and throat (ENT) specialist. Mrs. Hall complained of dizziness, nausea, and feeling intoxicated, although she reported no complaints of hearing loss and no ringing in the ears. Dr. Williams diagnosed Mrs. Hall with vertigo, caused by Gentamicin treatment. He recommended further evaluation with an ENG (electronystagmogram), Phenergan for nausea, and a referral to a neurologist.
On August 11, 1995, Mrs. Hall failed to keep an appointment at the Clinic. On August 23, she again failed to keep a Clinic appointment. When contacted by the Clinic on October 10, Mrs. Hall indicated that she was no better, but that she was to see Dr. Newton Coker and that she would call back with the results from that visit. When the Clinic attempted to contact Mrs. Hall on October 31, 1995, her phone had been disconnected.
In late November 1995, Mrs. Hall saw Dr. Melton Horowitz, an ENT specialist in Houston. Dr. Horowitz determined that Mrs. Hall suffers from vestibular dysfunction sustained through Gentamicin ototoxicity. Her condition is permanently disabling. Dr. Hillary Brodie, the Department of Otolaryngology Chair at the University of California Davis, also saw Mrs. Hall. He likewise determined that Mrs. Hall suffers from severe bilateral vestibular injuries secondary to Gentamicin ototoxicity. Dr. Brodie indicated that there is no medical treatment for Mrs. Hall's condition, which is permanent and irreversible and which significantly compromises her mobility and stability. As Dr. Horowitz explained, Mrs. Hall presents a danger to herself daily if left alone. She has a propensity to fall when performing simple tasks, such as bending over to retrieve an object or taking a shower. She has chronic problems with dizziness, vertigo, and nausea. A formerly independent person, Mrs. Hall must now rely on assistance from family members to get through the day.
On July 29, 1996, Mr. and Mrs. Hall filed suit against Brookshire Brothers, Mr. Vines, and the Sulphur Surgical Clinic. The petition was later amended to include Drs. Ledet and Seale. Also on July 29, a medical review panel was instituted. That panel, consisting of three general surgeons, eventually determined that Brookshire Brothers and Mr. Vines were not *563 fund-qualified and, therefore, declined to make a finding regarding the overfilling of Mrs. Hall's prescription. The panel unanimously concluded that Dr. Seale deviated from the applicable standard of care, although it found that Dr. Ledet did not. The panel expressed uncertainty as to whether Dr. Seale's actions caused any vestibular damage after September 1996.
In early 2000, the Halls reached a settlement agreement with Dr. Seale and his insurer. On June 2, 2000, the district court signed a judgment approving the settlement between the Halls and Dr. Seale for $100,000.00 with a reservation of rights against the Patient's Compensation Fund Oversight Board in accordance with the provisions of LSA-R.S. 40:1299.44(C). The judgment also expressly "recogniz[ed] and establish[ed] the liability of defendant, Dr. A. Kent Seale, as admitted, as provided by LSA-R.S. 40:1299.44(C)(5)."
On the same date, the Halls filed a motion for partial dismissal, dismissing their suit against Dr. Ledet and the Sulphur Surgical Center without prejudice. The Patient's Compensation Fund (hereinafter the "Fund") responded to the Hall's petition and asserted a cross-claim against Mr. Vines, Brookshire Brothers, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, claiming entitlement to indemnity and/or contribution from these parties in the event that the Halls proved entitlement to judgment against the Fund.
The Halls subsequently filed a Motion for Partial Summary Judgment seeking to establish the liability of Mr. Vines and Brookshire Brothers. Before that motion could be heard, however, the Halls settled their claims against these defendants and withdrew their motion. Following the settlement, the Fund filed its own summary judgment motion, which the district court granted in part. The court found that Mr. Vines was employed by Brookshire Brothers and that he breached the standard of care required of him. However, the court reserved for determination at the trial on the merits the extent of damage and causation.
In early December 2000, Mr. and Mrs. Hall filed a pre-trial Motion to Strike and/or Motion for Partial Summary Judgment, asserting that their $100,000.00 settlement with Dr. Seale amounted to an admission of liability which precluded the Fund from contesting matters other than damages. Following a hearing on the motion, the district court ruled that the Fund would not be allowed to proceed with a comparative fault argument. The Fund applied for supervisory writs to the court of appeal, which granted the Fund's application and reversed the district court's ruling. Hall v. Brookshire Brothers, Ltd., 01-397 (La.App. 3 Cir. 4/1/01). The case proceeded to trial on June 25, 2001.
On June 28, 2001, the jury returned a verdict finding Dr. Seale 85% at fault, Mr. Vines 10% at fault, and Mrs. Hall 5% at fault. The jury awarded $1,000,000.00 for physical and mental pain and suffering and loss of enjoyment of life (past and future); $500,000.00 for permanent or partial physical disability (past and future); $146,834.00 for loss of earning capacity; and $35,251.43 for past medical expenses. The jury also found that Mrs. Hall is in need of future medical care in the amount of $3,862,835.00. Mr. Hall was awarded $200,000.00 for his loss of consortium.
Some months later, a dispute arose with respect to the application of the percentages of fault to the verdict rendered by the jury. Following a hearing on August 23, 2001, and pursuant to the limitation of LSA-R.S. 40:1299.42(B), the district court signed a judgment for the full sum of $429,963.72, reflecting a reduction of 15% for victim and third party fault in accordance *564 with La. C.C. art. 2323, together with legal interest thereon from May 31, 1996 until paid. The judgment also decreed that Mrs. Hall is a patient in need of future medical care and related benefits in accordance with LSA-R.S. 40:1299.43.
Both the Halls and the Fund appealed. The Third Circuit Court of Appeal rendered its decision on August 21, 2002. Hall v. Brookshire Brothers, Ltd., XXXX-XXXX (La.App. 3 Cir. 8/21/02), 831 So.2d 1010. In a lengthy and well-reasoned opinion, the court of appeal affirmed the judgment of the district court in its entirety, with Judge Thibodeaux dissenting from that portion of the majority opinion which permits the quantification of victim and third party fault when a qualified health care provider has admitted liability by payment of $100,000.00 to the injured plaintiff.
Following the rendition of the court of appeal decision, both the Halls and the Fund filed writ applications in this court. We granted certiorari primarily to address three issues raised by the parties: (1) the propriety of quantifying victim and third-party fault in suits against the Fund when the health care provider has admitted liability by tendering the payment of $100,000.00; (2) the proper method for calculating the percentage reduction for comparative fault when the award of damages in a malpractice action exceeds the statutory cap; and (3) the accrual of legal interest on the amounts awarded by the jury.[1]Hall v. Brookshire Brothers, Ltd., 2002-2404 and 2002-2421 (La.11/27/02), 831 So.2d 285.

LAW AND DISCUSSION
I. VICTIM AND THIRD PARTY FAULT
The first issue we granted certiorari to consider is whether the Fund should be allowed to introduce evidence of victim and/or third party fault when a qualified health care provider has admitted liability and tendered $100,000.00 pursuant to the provisions of LSA-R.S. 40:1299.44(C)(5).
After settling with Dr. Seale for $100,000.00 and reserving their right to proceed against the Fund in accordance with LSA-R.S. 40:1299.44(C), the Halls filed a pre-trial Motion to Strike and/or Motion for Partial Summary Judgment asserting that their $100,000.00 settlement with Dr. Seale amounted to an admission of liability which precluded the Fund from contesting at trial matters other than damages and certain defenses raised in the Fund's objections to the Joint Petition for *565 Settlement of a Medical Malpractice Claim. The Halls also argued that partial summary judgment on liability should be entered against the Fund, since after the settlement, there was no longer a genuine factual dispute that damages exceeded $100,000.00. Following a ruling from the district court prohibiting the Fund from proceeding with a comparative fault argument, the Fund applied for supervisory writs to the court of appeal. The court of appeal granted the Fund's writ application and reversed the ruling of the district court, explaining:
The trial court erred in striking the relator's allegations of other-party fault. Although "the court shall consider the liability of the health care provided as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars," pursuant to La.R.S. 40:1299.44(C)(5), the Louisiana Supreme Court indicated in Graham v. Willis-Knighton Med. Center, 97-188 (La.9/9/97); 699 So.2d 365, that the plaintiff retains the burden of proving that the malpractice at issue caused damages in excess of the $100,000 settlement. Furthermore, damages must be apportioned between all parties at fault according to La. Civ.Code art. 2323. Thus, given the allegations of potential liability on the part of actors other than the settling defendant, Dr. A. Kent Seale, issues of comparative fault (causation) remain as to damages in excess of $100,000.
Hall v. Brookshire Brothers, Ltd. 01-397 (La.App. 3 Cir. 4/1/01). The case against the Fund proceeded to trial. On June 28, 2001, the jury returned a verdict assessing fault as follows: Dr. Seale-85%; Mr. Vines-10%; and, Mrs. Hall-5%. Both the Halls and the Fund appealed.
On appeal, the Halls urged the court of appeal to reconsider its prior ruling on the issue of the admissibility of evidence of victim and/or third party fault in a suit against the Fund where the qualified health care provider has tendered $100,000.00 and statutorily admitted liability. Relying on Graham and a recent per curiam opinion from this court, Conner v. Stelly, XXXX-XXXX (La.1/30/02), 807 So.2d 827, in which we reversed a district court ruling prohibiting the Fund from arguing or presenting evidence before the jury that victim or third party fault caused any of the damages in that case, the court of appeal declined the invitation to revisit its prior ruling and held that the jury was properly permitted to quantify the fault of Mr. Vines and Mrs. Hall. Hall v. Brookshire Brothers, Ltd., 831 So.2d at 1023-1024.
Judge Thibodeaux dissented from the majority opinion on this issue, disagreeing with the majority's reading of Graham, and concluding that because our per curiam in Conner did not discuss the underlying facts or the reasons supporting our holding, it was not authoritative. Our grant of certiorari in this case was prompted in part by our desire to clarify the per curiam in Conner and to preclude any doubt that may exist as to the admissibility of evidence of victim and/or third party fault in a suit against the Fund for damages in excess of the $100,000.00 tendered by the negligent health care provider.
The Medical Malpractice Act, adopted in 1975 in response to a perceived "crisis" in the delivery of health care arising from the burgeoning and increasingly prohibitive costs of medical malpractice insurance, seeks to further two competing goals: to ensure the availability of safe and affordable health care services to the public and to simultaneously limit the potentially significant liability exposure of health care providers. Everett v. Goldman, 359 So.2d 1256, 1261 (La.1978). In *566 furtherance of these goals, the Act caps the total amount recoverable for all malpractice claims for injuries or death to a patient at $500,000.00 plus interest and costs, and limits a qualified health care provider's liability for the malpractice claims of any one patient to $100,000.00 plus interest. LSA-R.S. 40:1299.42(B)(1) and (2). In the event that a medical malpractice claimant settles with the qualified health care provider for the $100,000.00 limit of liability, the claimant may then demand any excess amounts owed him or her by virtue of a judgment or settlement (subject to the $500,000.00 cap) from the Fund. LSA-R.S. 40:1299.42(C). Section 1299.44(C) of the Act outlines the procedure for determining the amounts in excess of the settlement, if any, to be paid from the Fund. Section 1299.44(C)(5) provides in pertinent part:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
This court has been called upon to interpret Section 1299.44(C)(5) of the Act, and the particular provision "the court shall consider the liability of the health care provider as admitted and established," on several occasions. See, e.g., Pendleton v. Barrett, 95-2066 (La.5/31/96), 675 So.2d 720; Jones v. St. Francis Cabrini Hospital, 94-2217 (La.4/10/95), 652 So.2d 1331; Stuka v. Fleming, 561 So.2d 1371 (La. 1990). Most recently, in Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365, we interpreted the quoted provision as follows:
We now conclude that the legislative intent of "liability" in Section 1299.44 C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.
Graham, 699 So.2d at 372.
Our holding in Graham marked a departure from this court's previous interpretation of the statutory language in Pendleton, supra.[2] It reflects a recognition that *567 the legislature intended the word "liability" in Section 1299.44(C)(5) to have the same meaning in the context of medical malpractice litigation as it does in any other tort case in which "liability" is admitted. See, Pendleton, 675 So.2d at 732 (Lemmon, J. dissenting).
Delictual liability consists of fault, causation, and damage. Dabog v. Deris, 625 So.2d 492, 493 (La.1993); Morris v. Orleans Parish School Board, 553 So.2d 427, 429 (La.1989). To establish liability, a plaintiff must prove that defendant's fault caused some legally compensable damage.
Liability implies some damage, but not specifically which damage or how much. Moolekamp v. Rubin, 531 So.2d 1124, 1126-1127 (La.App. 4 Cir.1988). Having proven that defendant's fault caused damage, a plaintiff must further prove what damage, by kind and seriousness, was caused by defendant's fault before the court can render an appropriate award. Id.
A defendant is only liable for that damage caused by his or her fault. Fault is a broad concept, encompassing all conduct falling below a proper standard. Weiland v. King, 281 So.2d 688, 690 (La.1973), citing Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).
When a defendant stipulates to liability, that defendant acknowledges that his or her fault (substandard performance of a legal duty owed to plaintiff for the protection from certain risks of harm) caused the plaintiff to sustain some damage (in the case of the qualified health care provider under the Medical Malpractice Act, that defendant stipulates that the damage he or she caused is at least $100,000).
However, there can be, and frequently is, more than one cause of a plaintiff's damages. Graves v. Page, 96-2201 (La.11/7/97), 703 So.2d 566, 570; Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1179. Because a defendant is liable only for that damage caused by his or her fault, when a defendant stipulates to liability for fault, he or she does not thereby necessarily concede responsibility for 100% of the fault.
In the same vein, when a health care provider tenders payment of $100,000.00, thereby admitting and establishing "liability," that admission of liability is an admission of fault and causation of damages of at least $100,000.00. It is not an admission of the percentage of fault attributable to the health care provider; nor is it an admission as to the extent of the claimant's damages beyond $100,000.00. Louisiana Revised Statute 40:1299.44(C)(5) speaks directly and exclusively to the liability of the health care provider; it is silent with respect to the responsibility of any other actor.
Louisiana Civil Code article 2323 requires that the fault of every person responsible for a plaintiff's injuries be compared, whether or not they are parties, regardless of the legal theory of liability asserted.[3] As we explained in Dumas v. State, Department of Culture, Recreation & Tourism, XXXX-XXXX (La.10/15/02), 828 So.2d 530, 537: "The comparative fault article, La. C.C. art. 2323, makes no exceptions for liability based on medical malpractice; on the contrary, it clearly applies to any claim asserted under any theory of liability, regardless of the basis of liability." Thus, in the trial against the Fund, wherein the plaintiff retains the burden of proving that the admitted malpractice *568 caused damages in excess of $100,000.00, evidence that victim or third party fault caused any of the damages is clearly relevant and admissible. Conner, supra.
While we are mindful that the Medical Malpractice Act, which substantially impedes the ability of an injured party to obtain full recovery of his or her damages, is in derogation of established rights and is to be strictly construed, Sewell v. Doctors Hospital, 600 So.2d 577, 578 (La.1992), in interpreting the language of a statute that is susceptible of different meanings we are obligated to apply and interpret the language of the statute in a manner which is consistent with logic and the presumed fair purpose and intention of the legislature in passing it. LSA-C.C. art. 10; City of Pineville v. American Federation of State, County, and Municipal Employees, AFL-CIO, Local 3352, XXXX-XXXX (La.6/29/01), 791 So.2d 609, 612. In this instance, our interpretation of the language of LSA-R.S. 40:1299.44(C)(5) is consistent with the overall purpose of the Act, which is to limit the liability of health care providers generally and thereby limit the skyrocketing costs of medical malpractice insurance. It is also consistent with specific provisions of the Act which make clear the legislature's intention to hold the Fund liable only for acts constituting medical malpractice. Louisiana Revised Statute 40:1299.41(I), for example, cautions that "[n]othing in this Part shall be construed to make the patient's compensation fund liable for any sums except for those arising from medical malpractice." Similarly and significantly, LSA-R.S. 40:1299.44(D)(2)(b)(x) authorizes the Fund to defend against claims due wholly or in part to the negligence of a non-covered health care provider or a product manufacturer, or both, regardless of whether a covered health care provider has settled and paid the statutory maximum. These provisions evidence an intent by the legislature that the Fund be able to limit its liability by demonstrating that the negligence or liability of another caused the plaintiff's damages. It is consistent with our interpretations of the statutory language in Graham, supra, and Conner v. Stelly, supra.
Admittedly, this interpretation of the effect of the admission of liability under LSA-R.S. 40:1299.44(C)(5) reduces the benefit that inured to plaintiffs under our prior jurisprudence. Nevertheless, as we pointed out in Graham, the plaintiff still receives a significant benefit in that the fault of the qualified health care provider is admitted, as is causation of damages of at least $100,000.00 in value. Graham, 699 So.2d at 372.
Accordingly, we find that the lower courts did not err in following the precepts of Graham and, more recently, Conner, and allowing the jury to quantify the fault of Mr. Vines and Mrs. Hall.

II. COMPUTATION OF DAMAGES
The second issue that prompted our grant of certiorari is the proper method for calculating the percentage reduction for comparative fault when the award of damages in a malpractice action exceeds the statutory cap. The issue is one of first impression in this court.
The jury's verdict sheet in this case reflects the following awards: $1,000,000.00 for physical and mental pain and suffering and loss of enjoyment of life (past and future); $500,000.00 for permanent or partial physical disability (past and future); $146,834.00 for loss of earning capacity; and, $35,251.43 for past medical expenses. The jury determined that Mrs. Hall is in need of future medical care and assessed the cost of that care at $3,862,835.00. Finally, the jury awarded *569 Mr. Hall $200,000.00 for his loss of consortium.
Following the return of the jury verdict, but prior to the entry of judgment, a dispute arose as to how to apply the fault percentages to the jury awards. The district court conducted a hearing on the issue. At the conclusion of that hearing, the district court rendered judgment based on the following calculations. First, the court reduced the total amounts awarded by the jury for pain and suffering, loss of enjoyment of life, disability, loss of consortium, and loss of earning capacity by 15%, reflecting the apportioned fault of Mrs. Hall and Mr. Vines. Because the remaining amount of damages exceeded the statutory cap, the district court reduced the award to $400,000.00 (after deducting $100,000.00 for the settlement with Dr. Seale). The court then reduced the award for past medical expenses by 15% and added that amount to the $400,000.00. The resulting judgment was for the full sum of $429,963.72, together with legal interest thereon from date of judicial demand (May 31, 1996) until paid. The judgment also declared Mrs. Hall to be a patient in need of future medical care and related benefits. The judgment did not include interest on the $100,000.00 received in settlement.
The court of appeal affirmed the district court's methodology in calculating damages. Both the Fund and the Halls sought writs on the issue. The Fund maintains that the district court should have applied the 15% reduction for the fault of Mr. Vines and Mrs. Hall after the award was reduced to the $500,000.00 cap of LSA-R.S. 40:1299.42(B)(1). The Halls contend that the district court should not have reduced Mrs. Hall's award for past medical expenses.
Louisiana Revised Statute 40:1299.42(B)(1) provides that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." This $500,000.00 cap is subject to a $100,000.00 previously paid settlement credit. LSA R.S. 40:1299.42(D).
As we explained previously in this opinion, the quoted provision was enacted as part of the Medical Malpractice Act of 1975, a comprehensive legislative package adopted in response to a perceived "crisis in the delivery of medical services to the people of this state, a crisis ostensibly prompted by prohibitive costs in connection with medical malpractice insurance." Everett, 359 So.2d at 1261. By placing a $500,000.00 cap on the total amount recoverable, the Act attempts to lower the cost of health care generally and thereby ensure the availability of safe and affordable health care to the public. Id.
In 1996, some years subsequent to the adoption of the Medical Malpractice Act, the legislature enacted a system of pure comparative fault in Louisiana. Amended by Act 3 of the 1st Ex.Sess. of 1996, LSA-C.C. art. 2323, entitled "Comparative Fault," now provides:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a *570 result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced. [Emphasis added.]
The Fund argues that the use of the phrase "damages recoverable" in the second sentence of Article 2323(A) mandates that the percentages of fault assigned to Mrs. Hall and Mr. Vines be applied to the damage award after its reduction to $500,000.00 because that amount constitutes the only "damages recoverable" under LSA-R.S. 40:1299.42(B)(1). According to the Fund, if in drafting LSA-C.C. art. 2323, the legislature had intended to apply the reduction for a plaintiff's fault to the total damages, it would have so stated, or at a minimum would have used only the word "damages," not the phrase "damages recoverable." We disagree with the Fund's interpretation.
We begin our examination, as we must, with the language of the codal article. Dumas v. State, Department of Culture, Recreation & Tourism, 828 So.2d at 536, ("[T]he starting point for the interpretation of any statute is the language of the statute itself."). In this instance, while La. C.C. art. 2323 applies in this medical malpractice proceeding, Id. at 537, the article is noticeably silent with respect to whether the percentage reduction for comparative fault is to be applied before or after imposition of the statutory cap.
In the absence of guidance from the words of the statute, we turn next to general principles of statutory interpretation, cognizant that the comparative fault and medical malpractice acts, both of which, being statutes which substantially impede the ability of an injured party to obtain full recovery of his damages, are in derogation of established rights and are to be strictly construed. See, Dumas v. State, Department of Culture, Recreation & Tourism, 828 So.2d at 537; Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709, 710. We remain mindful of the rule that when a law is clear and unambiguous and its application does not lead to absurd consequences, it should be applied as written and no further interpretation may be made in search of the legislative intent. LSA-C.C. art. 9. However, we also recognize that "[w]hen the literal construction of a statute produces absurd or unreasonable results `the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result.'" Fontenot v. Chevron U.S.A. Inc., 95-1425 (La.7/2/96), 676 So.2d 557, 562, quoting Green v. Louisiana Underwriters Insurance Co., 571 So.2d 610, 613 (La.1990).
Turning first to the language of the statute, we note that LSA-R.S. 40:1299.42(B)(1) states that "[t]he total amount recoverable for all malpractice claims ... shall not exceed five hundred thousand dollars." (Emphasis added.) The statute thus limits the amount that a qualified health care provider and the Fund have to pay as a result of medical malpractice; but it does not limit the damages that a medical malpractice victim sustains. Nor can it. "Damage" is defined by BLACK'S LAW DICTIONARY, 393 *571 (7th ed.1999), as "loss or injury to a person or property." The damages sustained by a medical malpractice victim are distinct from the amount that can be recovered for those damages. Legislative fiat cannot limit the extent to which a medical malpractice victim sustains damage. Legislation can only limit the amount that can be recovered for those damages.
While LSA-R.S. 40:1299.42(B)(1) limits the amount that a qualified health care provider and the Fund have to pay as a result of medical malpractice, LSA C.C. art. 2323, on the other hand, speaks to the damages recoverable.[4] These are separate concepts which, contrary to the Fund's position, cannot be linked summarily. The amount that is to be paid to the victim of proven malpractice is not synonymous with the damages recoverable by that victim, which are, simply stated, the total damages assessed by the trier of fact.[5] To equate the amount recoverable under LSA-R.S. 40:1299.42(B)(1) with the damages recoverable under LSA-C.C. art. 2323, as the Fund urges this court to do, would run afoul of several rules of statutory interpretation. First it would ignore the different language employed by the legislature in the two provisions, a choice we must presume to have been deliberate. See, e.g., ABL Management, Inc. v. Board of Supervisors of Southern University, XXXX-XXXX (La.11/28/00), 773 So.2d 131, 135, ("It is presumed that every word, sentence or provision in the statute was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used.... [Further, t]he Legislature is presumed to have enacted each statute with deliberation and with full knowledge of all existing laws on the same subject.") (Citations omitted.) Second, it would violate the principle that statutes in derogation of established rights are to be strictly construed. And, finally, the interpretation urged by the Fund would lead to an absurd result. That interpretation of LSA-C.C. art. 2323 would have the damages sustained by the malpractice victim, the value of which has already been significantly reduced by virtue of the statutory cap, reduced further, imposing a double reduction on the victim of proven malpractice who bears some percentage of responsibility for his or her injuries. Such a result is unreasonable and manifestly unjust and is not supported by the language, purpose, or intent of the comparative fault act.[6]
*572 For example, while the Fund argues that reducing an award by comparative fault prior to applying the cap of LSA-R.S. 40:1299.42(B)(1) violates the fundamental purpose of comparative fault to ensure that "each tortfeasor pays only for that portion of the damage he has caused," Dumas, 828 So.2d at 538, because Mrs. Hall receives no reduction for her participation in her own injuries, such is not the case. The Fund's argument in this regard is premised on the mistaken assumption that the purpose of comparative fault is to punish the partially negligent plaintiff. Not so. The initial purpose of LSA-C.C. art. 2323, which establishes a pure comparative fault system in Louisiana, was to ameliorate the harshness of the former contributory negligence doctrine by apportioning losses between a plaintiff and defendant when both are negligent. Dumas, 828 So.2d at 533 ("The amendment ... was beneficial to plaintiffs in that it increased the probability that they would be compensated, at least in part, for their injuries."); Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 971 (La.1985). However, Mrs. Hall is already recovering an amount less than the jury determined she was damaged by the tortious conduct of Dr. Seale and Mr. Vines due to the operation of LSA-R.S. 40:1299.42(B)(1). No purpose would be served by further reduction.
A simple hypothetical illustrates this point. A plaintiff rendered quadriplegic as a result of the defendant's medical malpractice is determined to be 10 percent comparatively at fault and is awarded $1,000,000.00 in damages. Under the Fund's position, this plaintiff's damage award, already reduced to $400,000 (excluding the $100,000.00 contribution of the health care provider) will be further reduced by another $40,000.00, even though the jury found that the fault of others proximately caused the plaintiff $900,000.00 (after deduction of the plaintiff's 10% fault) in damages. That further $40,000.00 reduction will not serve to bring the award into alignment with principles of comparative fault. Rather than pay 40% of the plaintiff's damages, the Fund would be responsible for only 36% of those damages. While LSA-C.C. art. 2323 requires that each party bear responsibility for his or her own fault, it does not require that a plaintiff who is only 10% at fault suffer a reduction of her recovery from 40% (under the cap) to 36% (after applying the reduction for comparative fault to the cap), thereby enhancing and amplifying the reduction imposed upon the plaintiff.
Contrary to the Fund's contention, when a verdict is reduced by comparative fault before the cap of LSA-R.S. 40:1299.42(B)(1) is applied, there is no risk that the plaintiff will recover damages that the jury found were caused by him or her. By definition, as long as the entire verdict is reduced by the plaintiff's comparative fault, there is no chance that the plaintiff will recover damages which the fact-finder determined he or she caused. The purpose of comparative fault remains intact. Likewise, there is no risk that, contrary to the provisions of LSA-R.S. 40:1299.41(I), the Fund will be made responsible for any sums except those arising from the medical malpractice.
The Fund cites to this court's decision in Bullock v. Graham, 96-0711 (La.11/1/96), 681 So.2d 1248, overruled on other grounds, Benoit v. Allstate Ins. Co., XXXX-XXXX (La.11/28/00), 773 So.2d 702, as support for its method of calculation. In Bullock, the plaintiff in a personal injury action alleged that the amount in controversy did not exceed $20,000.00 (the monetary *573 threshold for a jury trial at that time). The defendant and its insurer made that same stipulation by amended answer. The trial court determined that the plaintiff was entitled to $20,000.00 in general damages and $8,289.00 in special damages, or total damages of $28,289.00, subject to a reduction of 40 percent for contributory negligence. The court rendered judgment in the amount of $16,973.00 (representing damages of $28,289.00 reduced by forty percent). On appeal, the intermediate court reduced the judgment to $12,000.00, calculated by viewing the amount in controversy as $20,000.00 and then reducing that amount by forty percent. Reasoning that the plaintiff alleged freedom from fault and stipulated that the amount in controversy did not exceed $20,000.00, this court concluded that the most the plaintiff could receive, if free from fault, was $20,000.00, which must be reduced because the plaintiff was partially at fault, and affirmed the decision of the intermediate court.
We find that the situation in Bullock is factually distinguishable from that presented in this case and that the Fund's reliance on that decision is misplaced. In a deliberate effort to prevent a jury trial, the plaintiff in Bullock stipulated that the most she could expect to recover, if found free from fault, was $20,000.00. The recovery of her total damages was limited by her own stipulation as to the value of those damages; not by operation of law. The defendant, deprived of its right to a jury trial by the plaintiff's stipulation, could not fairly have been further penalized by having that stipulation disregarded when the total damage award exceeded the amount of the stipulation. Thus, it was the voluntary action of the plaintiff that limited her recovery. Because of its unique facts, Bullock does not provide support for the method of calculation urged by the Fund.
In summary, we decline to adopt the construction of LSA-C.C. art. 2323 urged by the Fund in the context of the medical malpractice act. For the reasons assigned, we find that the district court properly applied the jury's comparative fault finding before reducing the award of damages under LSA-R.S. 40:1299.42(B)(1).
The Halls also assign error to the district court's computation of damages in this case, arguing that the award for past medical expenses should not have been reduced by the 15% comparative fault assigned by the jury to Mrs. Hall and Mr. Vines. The Halls' argument is premised on the contention that the jury's award for future medical expenses should have been included in the calculation of the total damage award, the 15% comparative fault should have been deducted from this figure, and only then should the statutory cap have been applied. In other words, the Halls contend that the award for future medicals should have been included in the determination of the amount of damages.
The fallacy of this argument is easily exposed. Louisiana Revised Statute 40:1299.43 provides for the award of "future medical care and related benefits" to "patients in need of care." The award contemplates "all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of the injury." LSA-R.S. 40:1299.43(B)(1). By virtue of LSA-R.S. 40:1299.42(B)(1), the award for future medical care and related benefits is expressly excepted from the statutory cap. Because the award is not subject to the cap, it cannot be aggregated with the awards for other compensable damages a malpractice victim sustains for purposes of determining the plaintiff's total damages and applying the reductions *574 for comparative fault and the statutory cap. Thus, the district court did not err in segregating the award for future medical care and related benefits from its calculation of the total damages sustained by Mrs. Hall for purposes of applying the statutory cap, and subjecting that award to a separate 15% reduction for the comparative fault assessed by the jury.

III. JUDICIAL INTEREST
The third and final issue that prompted our grant of certiorari concerns the matter of legal interest. The jury's verdict reflects a total damage award of $5,744,920.43, including $3,862,835.00 for Mrs. Hall's future medical care. The Halls contend that the Fund owes legal interest on the entire amount awarded by the jury, prior to the imposition of the statutory cap, or, at a minimum, on the award for future medical expenses. We disagree.
The Halls rely on two statutory provisions for their contention that the Fund owes legal interest on the total damage award of the jury: LSA-R.S. 40:1299.47(M) and LSA-R.S. 40:1299.42(B)(1). Louisiana Revised Statute 40:1299.47(M) provides that "[l]egal interest shall accrue from the date of filing of the complaint with the [patient's compensation fund oversight] board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part."[7] Louisiana Revised Statute 40:1299.42(B)(1) states that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient ... shall not exceed five hundred thousand dollars plus interest and cost." The Halls argue that reading these provisions in pari materia compels the conclusion that legal interest accrues on the total damage award from the date of filing of the complaint with the board because LSA-R.S. 40:1299.42(B)(1) makes it clear that the $500,000.00 cap on medical malpractice claims "excludes any reduction of interest and cost."
The Halls' argument, based on a strained reading of the statutory language, is flawed. First, LSA-R.S. 40:1299.42(B)(1) is not ambiguous with respect to its limitation ("[t]he total amount recoverable ... shall not exceed five hundred thousand dollars."). Legal interest, which is intended to compensate ultimately victorious litigants for the value of money to which they are entitled and of which they have been deprived during the pendency of litigation, Trentecosta v. Beck, 95-0096 (La.App. 4 Cir. 2/25/98), 714 So.2d 721, 726 (on reh'g), writs denied, 98-1578, 98-1585 (La.10/9/98), 726 So.2d 28, simply cannot accrue on, and has no application to, an amount the victorious malpractice claimant is not owed and cannot recover as a matter of law. Because the Fund is not responsible for the entire amount awarded by the jury, but only for $400,000.00 for which it was cast in judgment, it cannot be responsible for interest on those amounts *575 it does not owe.[8]
Moreover, LSA-R.S. 40:1299.47(M) clearly states that "[l]egal interest shall accrue ... on a judgment rendered by a court in a suit for medical malpractice" (emphasis added). The judgment in this case casts the Fund for damages in the sum of $429,963.72. While the judgment does incorporate the jury's verdict, in medical malpractice actions, it is not necessary to enumerate in the judgment the exact amount that a claimant might have been awarded in damages over and above the statutory limitation. Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000, 1012-1013 (La.App. 1 Cir.), writ denied, 434 So.2d 1093 (1983). It suffices to establish that the damages equal an amount in excess of the $500,000.00 limitation. Id.
The legislature has evinced a clear intent in LSA R.S. 40:1299.42(B)(1) to limit recovery of damages (exclusive of future medical care and related benefits) to $500,000.00 plus interest and costs. The statute does not authorize the recovery of interest on damages in excess of the statutory limit, and consistent with the purpose of the Medical Malpractice Act to lower the costs of health care generally and assure the availability of health care for the public, we decline to read such a requirement into the statute. See, Allen v. State, 535 So.2d 903, 914-915 (La.App. 2 Cir.), writ denied, 536 So.2d 1201 (1988).
In 1984, the legislature added provisions to the Medical Malpractice Act affording "future medical care and related benefits" to "patients in need of care." LSA-R.S. 40:1299.43. The purpose of the statutory provision is to grant severely injured malpractice victims, who have been deprived by the cap of compensation for any necessary medical service, a speedy, convenient, and inexpensive administrative remedy for the payment of actually incurred medical expenses, without limit except as tailored to the patient's needs. Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210, 1216-1217. The legislation aims to remedy to an extent the damage cap's harsh tendency to prune recovery inversely to the injury, and to provide cost-effective, actuarially sound methods for financing and delivering compensation for medical services necessitated by medical malpractice. Id.
Consistent with this purpose, LSA-R.S. 40:1299.43(A)(1) states that "[i]n all malpractice claims filed with the [patient's compensation fund oversight] board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof." The Halls seize upon this language to argue that the award for future medical care in a malpractice claim is no different, and no less speculative, than an award for future medical expenses in any other tort case, that interest is allowed on such judgments in general tort actions, and that there is no basis for treating the awards to general tort claimants and medical malpractice victims differently. The Halls contend that if the legislature did not intend the award for future medical care and related benefits to bear interest, it would not have required the jury to establish the dollar value of that future care in an interrogatory.
*576 The argument asserted by the Halls is not a novel one. It has been considered by the intermediate courts and, in our opinion, properly rejected. See, Maxwell v. Soileau, 561 So.2d 1378, 1390-1391 (La. App. 2 Cir.), writs denied, 567 So.2d 1123, 1124 (1990); Lamark v. NME Hospitals, Inc., 522 So.2d 634, 640 (La.App. 4 Cir.), writ denied, 526 So.2d 803 (1988).
Contrary to the contentions of the Halls, we have held that the claim for future medical benefits under the Medical Malpractice Act is a special statutory creation inherently different from a general tort law claim for a money judgment for damages. Kelty, 633 So.2d at 1217. As we noted in Kelty:
[T]he program is designed as a remedy, although only a partial, carefully cost-effective one, to the harsh effects of recent changes in medical malpractice tort law. A claimant must meet a special definition of "need" to be entitled to benefits and may receive recompense for actual necessary medical expenses only so long as that need continues.
Id. Once a judgment is entered in favor a patient who is found to be in need of future medical care and related benefits, that patient must submit all claims for future medical care to the Fund through the patient's compensation fund oversight board. LSA-R.S. 40:1299.43(C). The Fund has 30 days from submission in which to pay a claim for medical care. LSA-R.S. 40:1299.43(E).
In the context of the Medical Malpractice Act, then, future medical expenses are to be paid when and as incurred.[9] LSA-R.S. 40:1299.43. With respect to the accrual of legal interest on these expenses, we agree with and adopt the holding of the court of appeal in Lamark, 522 So.2d at 640:
Section 1299.43, specifically dealing with future medical care and related benefits, makes no mention of interest. Nevertheless, we do not believe that the legislature intended for interest to be paid from the date of demand on judgment amounts which the statute specifies are to be paid as and when incurred.
Interest on future medical benefits is thus payable from the date of the filing of the complaint or the date the expenses were incurred, whichever is later.[10]Id. In this case, since the $35,251.43 award for past medical expenses, which was reduced to $29,963.72, represents "future" medical expenses that have already been incurred, interest is owed on this amount. However, the $3,862,835.00 award for future medical care represents expenses that have not yet been incurred. As such, legal interest is not owed on this amount unless and until the expenses are actually incurred.

*577 CONCLUSION
For the foregoing reasons, we affirm the decision of the Third Circuit Court of Appeal in its entirety.
AFFIRMED.
CALOGERO, C.J., concurs.
NOTES
[1] The Fund argued in the court of appeal, and now complains in this court, that the district court judgment is erroneous in the following additional respects: (1) the district court abused its discretion in failing to strike a prospective juror for cause and forcing the defense to use its peremptory challenges; (2) the district court erroneously admitted the cumulative testimonies of Drs. Brodie and Horowitz; (3) the district court erred in allowing Mrs. Hall to testify as to the fault of Dr. Seale in light of the fact that his liability was statutorily admitted; (4) the district court erred in striking the testimony of the Fund's expert pharmacologist, Dr. Finn; (5) the jury erred in finding causation of damages in excess of $100,000.00 where the negligence of the pharmaceutical defendants was an intervening and superceding cause of Mrs. Hall's injuries; (6) the jury's apportionment of only 10% of the fault to the pharmaceutical defendants was clearly wrong; (7) the jury's apportionment of only 5% of the fault to Mrs. Hall was clearly wrong; and (8) the amount of damages awarded was excessive. Before this court, the Halls also additionally complain that the jury clearly erred in assessing Mr. Vines with 10% and Mrs. Hall with 5% of the fault for her injuries. We have reviewed the record and the contentions of the parties with respect to each of the foregoing assigned errors and find no clear error in the court of appeal's resolution of these issues.
[2] In Pendleton, we interpreted the statutory admission of liability in Section 1299.44(C)(5) as relieving a medical malpractice claimant of the obligation of proving a causal connection between the admitted malpractice and the claimant's original and primary harm. As to any secondary damages, however, we held that the claimant has the burden, at the trial against the Fund, of proving that the secondary harm was caused by the medical negligence. Pendleton, 675 So.2d at 730. To facilitate this procedure, we placed a duty on the trial judge to distinguish, pre-trial, between the original or apparent harm, which the admission of liability encompasses, and the secondary harm, concerning which the claimant continues to bear the burden of proof. Id. In Graham, we abandoned the Pendleton procedure, finding that as a matter of practical application, it proved to be procedurally cumbersome and inefficient. Graham, 699 So.2d at 372. As we pointed out in Graham, the inefficiency of the Pendleton procedure becomes particularly apparent in cases alleging loss of chance. Although the Pendleton procedure admits liability as to the loss of chance, and therefore obviates the need to prove causation as to that loss, the claimant nonetheless possesses the burden of proving the value of the loss of chance. However, when the claimant offers evidence seeking to quantify the loss of chance, he or she in fact argues causation and undermines the benefit provided by the settlement's admission of liability. Id. Accordingly, this court in Graham opted to abandon the Pendleton procedure and to refocus on "which party has the burden of proving causation at trial." Id.
[3] The text of LSA-C.C. art. 2323 is quoted in full in section II of this opinion, infra.
[4] As Professor David Robertson notes in discussing similar language in LSA-C.C. art. 2324 (prior to its 1996 amendment), the phrase "`[r]ecoverable damages' is a notoriously ambiguous phrase." Robertson, Solidary liability in Tort, Understanding Gauthier and Touchard, part 2, 41 La.B.J. 334, 336 (1994).
[5] We are mindful of the different definition accorded to the phrase "recoverable damages" as it appeared in LSA C.C. art 2324 prior to its 1996 amendment by the court of appeal in the case of Ventress v. Union Pacific Railroad Company, 95-1240 (La.App. 4 Cir. 12/28/95), 666So.2d 1210, writ granted in part, judgment rev'd in part, 96-0501 (La.5/3/96), 672 So.2d 668. However, we are not called upon here to determine the correctness of the court of appeal's decision in Ventress. Rather, we mention the decision only for the purpose of distinguishing its holding from the present case, which does not require an interpretation of the former provisions of LSA C.C. art. 2324 or the effect of the solidary liability it imposes upon tortfeasors.
[6] Further, as the court of appeal opinion points out, the Fund's argument for a literal interpretation of Article 2323 would produce a logical inconsistency: "The second sentence of paragraph A provides that `damages recoverable' shall be reduced only by the percentage of negligence of the plaintiff (`the person suffering the injury, death, or loss'), yet the Fund argues we should reduce the `damages recoverable' of $400,000.00 by the fault assessed to both Mrs. Hall and Mr. Vines." Hall v. Brookshire Bros., Ltd., 831 So.2d at 1028 (emphasis in original).
[7] In tort actions generally, legal interest attaches from date of judicial demand. LSA-R.S. 13:4203. Such an award of legal interest is designed to compensate a plaintiff for his loss of the use of money to which he is entitled, the use of which defendant had during the pendency of the litigation. Trentecosta v. Beck, 95-0096 (La.App. 4 Cir. 2/25/98), 714 So.2d 721, 726 (on reh'g), writs denied, 98-1578, 98-1585 (La. 10/9/98), 726 So.2d 28. In the case of medical malpractice claimants, there is an extended period of loss of use because the claimant must first submit his or her complaint to a medical review panel before commencing litigation. LSA-R.S. 40:1299.47(M) reflects the legislature's determination that the general rule of interest accrual in tort actions should be adjusted to account for the statutorily imposed delay that medical malpractice claimants face.
[8] Likewise, it is not liable for interest on the $100,000.00 tendered by Dr. Seale in settlement. The responsibility for interest on this amount clearly lies with the health care provider, pursuant to LSA-R.S. 40:1299.42(B)(2) ("A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon.") (Emphasis added.) The Halls do not contend otherwise.
[9] Pursuant to statute, "future medical care and related benefits" encompasses all past, present, and future medical and related care services necessitated by a qualified health care provider's negligencenot just what is usually thought of as "future" medical needs. LSA-R.S. 40:1299.43(B)(1); Kelty, 633 So.2d at 1217.
[10] The Halls' argument that the requirement in LSA-R.S. 40:1299.43(A)(1) that the jury in a medical malpractice action assign an amount to the future medical care and related benefits contemplates that interest is recoverable on this amount is of no avail to their position. The purpose of quantifying future medical expenses, as required by LSA-R.S. 40:1299.43(A)(1), is revealed in the provisions that follow that statute. The amount of future medical expenses awarded determines the method of payment of the judgment. See, LSA-R.S. 40:1299.43(A)(3), (4) and (5). It does not allow for the accrual of legal interest on that amount.