924 So.2d 1023 (2006)
Clifford A. CRANE, III and Linda Crane.
v.
S. Henry LaROCCA, M.D.A Professional Medical Corporation, Synthes Inc., Synthes (U.S.A.), Synthes North America, Inc., Synthes A.G. and ABC Manufacturing Company.
No. 2005-CA-0283.
Court of Appeal of Louisiana, Fourth Circuit.
January 18, 2006.
*1024 William D. Aaron, Jr., Goins Aaron, P.L.C., Baton Rouge, LA, and Richard T. Gallagher, Gallagher Law Firm, Metairie, LA, for Clifford A. Crane and Linda Crane, Plaintiffs/Appellees.
Bruce A. Cranner, Mary Ehret, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Louisiana Patient's Compensation Fund, Statutory, Intervenors/Appellants.
(Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MAX N. TOBIAS, JR., and Judge DAVID S. GORBATY).
MAX N. TOBIAS, JR., Judge.
On 25 September 1990, Clifford A. Crane, III ("Crane") was injured in an automobile accident when a vehicle driven by Willie Jackson ("Jackson") rear-ended his automobile. Shortly after the accident, Crane began experiencing back pain and sought treatment from Henry LaRocca, M.D. ("Dr.LaRocca"), an orthopedic surgeon who had treated Crane for prior injuries.[1] Following the automobile accident, Crane experienced pain in his right ankle, right heel, back, and radiating down his right leg. The pain from the accident caused him to stop working and Dr. LaRocca declared him disabled shortly after the accident.
*1025 In November 1990, Crane underwent three epidural injections to decrease swelling and reduce pain. By December 1990, the epidural was no longer relieving Crane's pain. Crane reported a pain level of 9, with 10 representing the worst pain imaginable.
On 19 February 1991, Dr. LaRocca performed an extension of the previous two-level fusion performed in 1983 with two additional levels of fusion. He inserted A.O. surgical plates and pedicle screws to stabilize the spine. Crane went back to work within two months of the surgery. As of May 1991, Crane was still working in his shop, even though he was suffering painful back spasms.
The February 1991 fusion failed and he had to undergo surgery again on 3 September 1991. In this surgery, Dr. LaRocca performed an anterior lumbar fusion with refixation of spinal hardware.
Once again, the fusion did not heal and Crane had to undergo a posterior lumbar revision to try to get the fusion extension to heal. On 26 December 1991, Charles Billings, M.D. ("Dr.Billings")[2], an orthopedic surgeon, removed the previous hardware implanted by Dr. LaRocca and utilized the "Texas Scottish Rite" procedure, whereby hooks and screws were placed into the spine from T7 to L5 and rods were threaded through the hooks and screws to provide stability.
Following surgery, Dr. Billings recommended that Crane not return to work for three months so that his fusion could heal. However, Crane returned to work sometime in April 1992, doing heavy labor in his mechanic's shop and working long hours. He was ultimately declared totally disabled by Dr. Billings. Dr. Billings opined that Crane would have a significant amount of pain to live through. Dr. Billings removed the rods in 1996, and told Crane that his spine had fused successfully.
In 1992, Dr. Billings referred Crane to Oliver Sanders, M.D. ("Dr.Sanders"), a psychiatrist, to help him manage his chronic back pain, depression, and drug dependency. Although Dr. Sanders had been advised to limit Crane's access to pain medication, Crane admitted that he "finagled" more drugs from him through his treatment. Dr. Sanders prescribed Crane narcotics for six years, until 1998.
Crane filed a complaint with a medical review panel, alleging that Dr. LaRocca had failed to meet the applicable standard of care in his treatment by (1) performing an unnecessary surgery in February 1991; (2) using incorrect instrumentation and performing the fusion at the wrong level in the February 1991 surgery; and (3) using an incorrect surgical procedure in September 1991 to attempt to correct the prior failed fusion. Crane asserted that these surgeries left him unable to work and in unrelenting pain.
On 23 May 1994, the medical review panel unanimously found that Dr. LaRocca had not failed to meet the applicable standard of care in his treatment of Crane. Specifically, the panel found that the anterior lumbar surgery performed in September 1991 was "medically indicated" and "appropriately performed."
On 18 August 1994, Crane and his wife, Linda Crane (collectively "the Cranes"), filed suit against Dr. LaRocca and the manufacturer of the spinal fixation system using pedicle screws used by Dr. LaRocca in the February 1991 surgery ("the Synthes defendants").[3]
*1026 St. Paul Fire and Marine Insurance Company, LaRocca's malpractice insurer, offered to settle the claim against Dr. LaRocca's estate[4] for $100,000.00, reserving to Crane the right to proceed against the Louisiana Patients' Compensation Fund and Fund Oversight Board ("PCF"). Shortly thereafter, on 14 August 2001, the Cranes filed a petition pursuant to La. R.S. 40:1299.44(C) to approve the settlement agreement and to demand excess damages from the ("PCF"). In particular, the petition alleged that Dr. LaRocca breached the standard of care with regard to both the February 2001 and September 2001 surgeries. On 20 September 2001, the trial court approved the settlement and ordered "that this settlement be deemed a statutory admission of liability under La. R.S. 40:1299.44(C)." Because Dr. LaRocca's estate tendered $100,000.00 in settlement, Dr. LaRocca became a nominal defendant, with the PCF stepping into his shoes.
The case was initially set for trial to begin on 9 February 2004. On 26 January 2004, the Cranes filed a motion in limine to "exclude evidence of prior settlements and intervention" on the grounds that evidence of the amount tendered on behalf of Dr. LaRocca ($100,000.00) would be more prejudicial than probative if presented to a jury and was not relevant to the inquiry of the jury.
The Cranes filed a second motion in limine seeking to exclude a proposed jury instruction on the stipulation of liability by Dr. LaRocca and further to exclude any evidence put forth by the PCF that Dr. LaRocca did not breach the standard of care. A third motion in limine sought to preclude the PCF from putting on evidence of contributory negligence or third party fault, insofar as those affirmative defenses were not raised in the original answer filed by the PCF.[5] Obviously, the Cranes sought to exclude any evidence of the settlement.
At the outset of the trial, the judge ruled on the motions in limine:
[I]t's my opinion and my ruling that this case is going to be tried on the question of quantum of damages only as it may be ameliorated by other factors, such as pre-existing conditions and/or actions on the part of the [plaintiff] which may have contributed to his own disability.
Although the jury trial commenced on 9 February 2004, the trial court declared a mistrial on the third day of trial because the PCF did not disclose videotape surveillance of Crane prior to trial that it attempted to introduce into evidence. The case was re-set for trial on 27 September 2004.
On 20 September 2004, the PCF filed a stipulation that "the February 19, 1991 lumbar fusion performed with AO plates and screws was unnecessary." The stipulation did not address the other allegations of malpractice surrounding the February 1991 surgery or the September 1991 surgery.
Prior to the second setting of the trial, the Cranes filed a motion in limine to exclude evidence that Dr. LaRocca did not breach the standard of care (the opinion of the medical review panel) because of the stipulation entered by the PCF. The trial court ruled that it would not allow the PCF to introduce the stipulation into evidence, but rather allowed the PCF to proffer *1027 it. No supervisory review of the ruling was sought. The trial court further ruled that it would not allow the opinion of the medical review panel to be submitted in evidence to the jury.
At the outset of trial, the trial court admonished the jury:
One thing I forgot to say to you before is that you do not have to make any determination on liability in this case. All you have to determine is how much money Dr. LaRocca has to pay for what he did. His liability is not in question.
So, with that and with the further reminder that you also have to deal with the question to what extent what Dr. LaRocca did was the cause of the injuries suffered by Plaintiff, that's probably the most important thing in your decision.
Crane testified that he began treating with Dr. LaRocca in 1983, when he underwent the initial two-level back fusion. He testified that at the time, he was smoking regularly, but that his smoking habit did not seem to interfere with his healing process. His back pain resolved following the surgery and he returned to doing heavy physical labor.
Crane saw Dr. LaRocca again after the 1990 automobile accident because he was experiencing back pain and had had a good result with him before. He underwent the February 1991 surgery at the recommendation of Dr. LaRocca. However, following the February 1991 surgery, his pain was very intense, and Dr. LaRocca recommended the September 1991 surgery. That surgery did not relieve his pain, and finally, in December 1991, Dr. Billings offered to remove the hardware that Dr. LaRocca had installed. Crane testified that prior to the February 1991 surgery, Dr. LaRocca had never told him he was disabled.
Crane described a marked decrease in physical activity following the surgeries in 1991. Prior to February 1991, and after the fusion in 1983, he had enjoyed hunting, playing baseball, coaching his son's baseball team, and doing chores around the house such as cutting the grass. He was also very involved in his church, teaching and supervising Sunday school classes. Now, he is unable to enjoy those activities. Similarly, he is unable to work in his mechanic's shop, but will drop by to socialize with the men working there, sometimes eating lunch with them. He also developed a serious problem with depression, addiction to narcotics, and a dramatic weight gain.
On cross-examination, Crane admitted that he had suffered from depression before the February 1991 surgery, seeking treatment at River Oaks Hospital, and that he left against medical advice. He admitted that he had returned to work doing heavy physical labor just one month following the May 1983 surgery, when Dr. LaRocca had advised him not to do any heavy labor. He also admitted that he had severe back pain after the 1990 accident but before the February 1991 surgery, and that he had seen chiropractors before going to Dr. LaRocca in 1990.
Following the February 1991 fusion, Crane signed a discharge instruction advising him not to smoke because it might interfere with the healing of his fusion. He admitted that he was still smoking in February 1991 both before and after his surgery. He went back to work within three months following the February fusion, performing alignments on trucks and pulling wrenches.
Mrs. Crane testified that following the 1991 surgeries, she had to assume control of the mechanic's shop and that Crane became less and less involved in the day-to-day activities in the shop. She confirmed *1028 that he lives with a great deal of pain and that his physical activities have decreased dramatically since 1991.
The Cranes presented testimony from an expert in orthopedic surgery, Joseph Rauchwerk, M.D. ("Dr.Rauchwerk"). At the outset of trial, the PCF objected to his anticipated testimony regarding breaches of the standard of care by Dr. LaRocca, on the grounds that it was irrelevant in light of the stipulation of liability and unduly prejudicial.[6] The Cranes countered that testimony regarding how Dr. LaRocca breached the standard of care was essential to assist the jury in assessing damages and allocation of fault. Further, the PCF's refusal to stipulate to all three alleged acts of malpractice opened the door for testimony as to how Dr. LaRocca breached the standard of care in those instances where no stipulation of liability was before the court. The trial court overruled the objection, ruling that "the evidence question relates to the question of causation."
Dr. Rauchwerk testified that, given the prior fusion undergone by Crane in 1983, Dr. LaRocca should have treated him conservatively and not performed the surgery in February 1991. He stated that prior to the February 1991 surgery, Crane had "no indications, not even one million of a percent for any surgical procedure." He further testified that not only did Dr. LaRocca perform an unnecessary surgery, he also performed the fusion on the wrong levels. Dr. Rauchwerk further opined that the choice of hardware used by Dr. LaRocca to stabilize Crane's spine was another breach of the standard of care and that it was doomed to fail because the screws needed to attach the plates to the spine necessarily did not fit the bones of the fused levels; the holes in the plates were pre-drilled and did not allow for modification to ensure that the plates were firmly screwed into bone.
With regard to the September 1991 surgery, Dr. Rauchwerk testified that, although the surgery was needed to re-stabilize Crane's spine following the failed previous surgery, Dr. LaRocca's technique breached the standard of care. Dr. Rauchwerk testified that Dr. LaRocca surgically entered Crane's back from the anterior, when a posterior entry would have been much less traumatic. Further, he grafted cadaver discs into Crane's spine to replace healthy discs he removed, which Dr. Rauchwerk opined should not have been removed. Dr. Rauchwerk testified that the correct procedure would have been to enter the back through a posterior incision, repair the fusion, re-graft it from the patient's iliac crest, and then put in new, different instrumentation. In particular, Dr. Rauchwerk noted that the Texas Scottish Rite instrumentation ultimately used in Crane's back by Dr. Billings was available on the market at that time and was approved by the Food and Drug Administration, unlike the hardware initially used by Dr. LaRocca in February 1991.
Dr. Rauchwerk testified that he examined Crane in February 2004. He noted that the muscles underneath the scars left from the back surgeries were "hard rock" and that his entire back was covered in scar tissue. He noted that Crane walked and stood with a forward flexion of approximately 40 degrees to compensate for the back pain he was experiencing and walked with poor balance. He noted that Crane was unable to walk on his toes, which was indicative of a S1 nerve root deficit. Further, *1029 Crane was unable to bend over to put on or take off his shoes. Dr. Rauchwerk testified that he had never seen a patient with a seven-level fusion that did not have either scoliosis or a fractured back. Crane had neither.
On cross-examination, Dr. Rauchwerk admitted that Crane's medical records reflect that his back pain was worse following the 1990 automobile accident before the February 1991 fusion. Further, he noted that Dr. LaRocca's notes revealed that Crane was disabled immediately following the automobile accident, even though Crane testified that he was not disabled until after the February 1991 fusion.
The PCF attempted to rebut Dr. Rauchwerk's testimony by presenting testimony from Dr. Billings. The PCF attempted to rehabilitate Dr. LaRocca, who it complains was painted as a "villain" by Dr. Rauchwerk:
Q: All right. Are you familiar with Dr. LaRocca's reputation
A: I am.
Q: in the community of orthopedic surgery?
A: I am.
MR. GALLAGHER: Your Honor, can we approach?
THE COURT: Yes.
(A bench conference was then held.)
This line of questioning was then abandoned, presumably after an admonition by the court and pursuant to an objection by the Cranes. Dr. Billings was then questioned regarding the surgeries performed by Dr. LaRocca and the wisdom in utilizing the AO pedicle screws in the surgery. During his testimony, the Cranes objected and a conference was held outside of the presence of the jury:
MR. GALLAGHER: Plaintiffs object to this entire line of questioning. In addition, we object to the previous line of questioning. These are questions regarding the standard of care, which is not the issue in this case, and which has been stipulated because of the $100,000.00 payment. And we would refer more fully, as far as our arguments, to our motion in limine filed prior to trial.
MR. CRANNER: My view of this is that the plaintiffs opened the door wide and all the cows ran out during Dr. Rauchwerk's testimony. He criticized the indications for surgery; he criticized the use of the plates; he criticized the use of the anterior and posterior approach in the secondary surgery. And since we have already decided that it would be inappropriate, given all things, to go into Dr. LaRocca's reputation, I must go around the edges of the standard of care question by simply establishing the facts.
THE COURT: What I propose to do is overrule your objection. I'm going to tell the jury right now that the testimony being elicited is not intended to relieve Dr. LaRocca of liability. He has legal liability. With that said, it is intended to go on mitigation of the extent for which he is responsible for the damages to the plaintiff.
Following the conference regarding the objection, the court admonished the jury:
Ladies and gentlemen of the jury, I told you at the beginning of the case, and I'll reiterate now, that Dr. LaRocca's liability exists as a matter of law in this case. He is liable. The question that you have to decide in this case is to what extent he's responsible for the damages suffered by Mr. Crane.
This testimony which you're about to hear is offered not to relieve Dr. LaRocca of liability, which of course can't *1030 happen, but in mitigation of the extent of his responsibility for Mr. Crane's condition.
The PCF then proceeded with the direct examination of Dr. Billings. Dr. Billings testified that the procedures used by Dr. LaRocca were not unusual and had been utilized by other orthopedic surgeons.
The PCF also presented the testimony of Harold Ginzburg, M.D., an expert in the field of psychiatry, who testified that Crane did not follow his physician's orders post-surgery and aggravated his own condition, ultimately causing the fusion to fail.
Following the trial, the jury returned with a verdict in favor of the Cranes in the amount of $2,845,000.00: $1,400,000.00 in general damages; $1,100,000.00 in special damages; $200,000.00 for loss of consortium; and $145,000.00 in past medical expenses. The jury apportioned fault among Crane, Dr. LaRocca, Dr. Sanders, and Willie Jackson as follows: Dr. LaRocca was found to be 90% at fault; Dr. Sanders was found to be free from fault; Willie Jackson was apportioned 5% fault; and Crane himself was found to be 5% at fault for his damages. The jury also found that Crane would require future medical care and related benefits.
As a result of the jury's verdict and apportionment of fault, and taking into consideration the limitation of liability found in the Louisiana Medical Malpractice Act, the trial court entered judgment against PCF in the amount of $500,000.00, plus $145,000.00 in past medical expenses, subject to a credit of $100,000.00 for the amount previously tendered on behalf of Dr. LaRocca. The total award against PCF was $545,000.00 with judicial interest from the date of the filing of the complaint with the medical review panel, until paid, as well as costs associated with the trial.
The PCF appealed the verdict of the trial court on two grounds. First, the PCF asserts that the trial court erred in allowing the Cranes to put forth testimony from Dr. Rauchwerk regarding the standard of care in "emotionally-charged and inflammatory terms" and denying the PCF an opportunity to rebut his testimony at trial. Specifically, the PCF argues that Dr. Rauchwerk's testimony describing how Dr. LaRocca breached the standard of care in his treatment of Crane was not relevant to the jury's inquiry, insofar as it related to liability and not causation, which was the specific issue before the jury. Further, the PCF argues that the prejudicial effect of the same testimony outweighed any probative value it might have otherwise had. Second, PCF asserts that the jury's damage award was excessive and should be reduced.
At the outset, both parties to this appeal agree that a trial court's rulings on evidentiary matters are subject to an abuse of discretion standard. Sanford v. City of New Orleans, 03-0883, p. 13 (La.App. 4 Cir. 1/21/04), 866 So.2d 882, 890; Lacey v. ABC Ins. Co., 97-1182, p. 13 (La.App. 4 Cir. 4/1/98), 712 So.2d 189, 196. The discretion of the trial court in such determinations is vast. Id.
First, we look to whether Dr. Rauchwerk's testimony was relevant to the issues before the jury pursuant to La. C.E. art. 402.[7] The PCF specifically takes issue with the following excerpts of Dr. Rauchwerk's testimony:

*1031 Q. Based upon your review of the records, Dr. Rauchwerk, even as of January 23, 1991 ... did Dr. LaRocca breach the standard of care in performing surgery on Mr. Crane on February 19, 1991?
A. The answer is yes.
* * *
Q. Is it fair to say that Dr. Warren recommended and the standard of care required that Dr. LaRocca continue conservative treatment of Mr. Crane?
A. Absolutely.
* * *
Q. Can you tell me whether [the anterior] approach from the front met the standard of care?
A. Absolutely not.
The PCF asserts that because the liability of Dr. LaRocca is statutorily admitted pursuant to Louisiana's Medical Malpractice Statute, R.S. 40:1299.44(C), any testimony seeking to establish that Dr. LaRocca breached the standard of care is irrelevant and superfluous and that the trial court should not have allowed it before the jury.
The Cranes assert that the PCF opened the door for Dr. Rauchwerk's testimony on the standard of care and how Dr. LaRocca breached it because of the stance it took at trial regarding the admission of liability. The stipulation entered by the PCF addressed only one alleged breach of the standard of care, while the Cranes sued upon three alleged breaches of the standard of care.
We note that La. C.E. art. 402 provides in pertinent part that "[e]vidence which is not relevant is not admissible." La. C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. arts. 401 and 402. Therefore, should the complained-of testimony "shed light upon or touch issues" in such a way as to enable the jury to draw a "logical and reasonable inference with respect to the matter or any principal fact at issue", it is relevant. Bourgeois v. McDonald, 622 So.2d 684 (La.App. 4 Cir.1993). We therefore examine the issues before the jury in this matter to determine the relevance of Dr. Rauchwerk's testimony.
A medical malpractice cases in which a healthcare provider has tendered $100,000.00 presents unique evidentiary issues. La. R.S. 40:1299.44 C provides that once a healthcare provider (or his/her insurer) tenders an amount in settlement to an aggrieved patient for alleged malpractice, the patient may file suit in district court to recover for damages above and beyond the amount tendered, not from the healthcare provider, but from the PCF. The PCF may not contest the liability of the healthcare provider who has tendered $100,000.00 in settlement of the claim; it is statutorily admitted pursuant to La. R.S. 40:1299.44. La. R.S. 40:1299.44 C(5)(e).[8] However, a limit exists to the amount of damages a healthcare provider has accepted legal responsibility for once he/she tenders $100,000.00 in settlement. The Louisiana Supreme Court, after examining the legislative intent behind La. R.S. 40:1299.44, held:

*1032 when a health care provider tenders payment of $100,000.00, thereby admitting and establishing "liability," that admission of liability is an admission of fault and causation of damages of at least $100,000.00. It is not an admission of the percentage of fault attributable to the health care provider; nor is it an admission as to the extent of the claimant's damages beyond $100,000.00.
Hall v. Brookshire Brothers, Ltd., 02-2404, p. 12 (La.6/27/03), 848 So.2d 559, 567.
The Court went on to confirm that since the issue of damages and causation above $100,000.00 is an open one for purposes of trial, the PCF is entitled to introduce evidence of the comparative fault of third parties, including the plaintiff, so that the percentage of fault attributable to the negligence of the healthcare provider may be reduced in accordance with La. C.C. arts. 2323 or 2324. Id. at p. 13, 848 So.2d at 567. Therefore, although a jury (or factfinder) is not charged with determining whether or not a settling healthcare provider breached the standard of care, it is charged with determining to what degree the breach caused the damages of the plaintiff above $100,000.00, especially in light of potential intervening or superseding causes.
As it is established that the plaintiff has the burden of establishing that the negligence of a settling healthcare provider caused damages in excess of $100,000.00, we are required to look at whether in carrying that burden, a plaintiff has introduced testimony establishing the negligent acts of the healthcare provider, even though it is statutorily admitted that the healthcare provider breached the standard of care.
Although it did not discuss in any detail the rationale behind its finding on this issue, the Louisiana Supreme Court found no error in allowing testimony detailing the negligent acts of the settling physician in Hall, supra. The opinion of the Court affirmed the finding by the Louisiana Third Circuit Court of Appeal that the plaintiff had been within her rights to present testimony regarding the "bad acts" of the defendant physician. The PCF argued in that case, as in this one, that "the prejudicial nature of her testimony was compounded" by the exclusion of testimony of an expert witness who would have given countervailing testimony regarding the negligence of the defendant. Id. at pp. 19-20, 831 So.2d at 1024-25. The Third Circuit had held that the testimony of the plaintiff regarding the "bad acts" of the defendant physician was relevant to the question of her own comparative fault, insofar as "evidence of Dr. Seale's instructions to Mrs. Hall, her understanding thereof, the chronology of events, and the general facts surrounding her treatment were relevant." Id. at p. 20, 831 So.2d at 1025.
We note, however, that the testimony at issue in Hall was that of the plaintiff herself, and not an expert physician. Although the rationale used to justify the testimony of the plaintiff in Hall cannot be extended to justify the introduction of testimony of Dr. Rauchwerk, we find that his testimony was relevant under a similar rationale: it was probative to the genuine issue of causation of the Cranes' damages beyond $100,000.00, which are significant (as discussed below). Thus, while we reject the assertion of the Cranes that Dr. Rauchwerk's testimony was relevant to the question of liability because of the "partial" stipulation drafted by the PCF opened the door for such testimony, we find that it was relevant to the issues *1033 before the jury.[9] Thus, we find that the trial court did not err in finding that Dr. Rauchwerk's testimony regarding the breach of the standard of care by Dr. LaRocca was relevant to the issue of causation of Crane's damages above $100,000.00, especially in light of the other potential causes of Crane's damages such as the automobile accident, Crane's admitted lapses in following medical advice, and any negligence on the part of Dr. Sanders. Because this specific point of law may be confusing to a jury, we further find that it is the trial court's duty to instruct a jury as specifically as possible on this point of law, and to explain carefully the legal extent of the admission of liability pursuant to La. R.S. 40:1299.44 and the burden of persuasion faced by each party to the litigation. Because the trial court's instructions to the jury are not at issue in this appeal, we do not reach a finding as to the adequacy of its instructions.
Next, the PCF asserts that portions of Dr. Rauchwerk's testimony should not have been allowed because they were inflammatory and more prejudicial than probative, in violation of La. C.E. art. 403. In particular, the PCF notes that Dr. Rauchwerk described Dr. LaRocca as a "maverick" and opined that following the 1990 automobile accident, he "[didn't] believe there is a surgeon in the world, much less in the U.S.A. that would recommend someone to go to the operating room and take the enormous chance, including dying, after that injury." He further confirmed this opinion by stating:
"That's a very, very, very, very, very, very easy, easy thing to see. You don't have to be a physician. You don't have to go to medical school; you don't have to go to high school; you don't have to go to grammar school."
With regard to Dr. LaRocca extending Crane's 1983 fusion, he testified: "if you extend the fusion two other levels, you will create a muscular skeletal cripple or a spinal cripple." He further opined that with regard to performing a seven-level fusion on a patient: "I believe you can interview a hundred fifty surgeons or a thousand fifty surgeons or fifteen hundred surgeons. I'm not sure you could find someone." With regard to the February 1991 surgery performed by Dr. LaRocca, Dr. Rauchwerk described in graphic terms that he had "stripped" tissue to make the posterior approach to the spine and that this had "killed" the blood supply.
We agree with the PCF that these portions of Dr. Rauchwerk's testimony are excessive in hyperbole. Although the Cranes argue that the PCF did not specifically object to the complained-of testimony,[10] we note that the PCF entered an *1034 objection to Dr. Rauchwerk's anticipated testimony on the grounds that it was not: "relevant given the admission of liability, statutory admission of liability in this case, and we feel as though that testimony or those opinions are being solicited to inflame the jury and, therefore, it's duly prejudicial under Rule of Evidence 403."
A review of the trial transcript reveals that the PCF had ample opportunity to cross-examine Dr. LaRocca and did so extensively. Although the PCF asserts that it was denied a meaningful opportunity to rebut the testimony through admission of the opinion of the medical review panel or the stipulation, it is unclear that they were unable to rebut his testimony through the testimony of Dr. Billings. He described the procedures used by Dr. LaRocca, much like Dr. Rauchwerk, and to give his estimation of the wisdom in utilizing those procedures. Further, the PCF was able to present the testimony of other expert witnesses, including Robert Shackleton, M.D. ("Dr.Shackleton"), an expert orthopedic surgeon, to rebut the testimony of Dr. Rauchwerk. Therefore, although we find that Dr. Rauchwerk's testimony may have been overly zealous, we find that any error was harmless in light of the PCF's ability to rebut the evidence.
Next we address the PCF's second assignment of error that the damages awarded to Crane were excessive. The PCF first asserts that the general damage award of $1,400,000.00 and the lost wage award of $1,000,000.00 "far exceed any amount that a reasonable trier of fact could assess under the facts presented." We disagree.
With regard to the general damage award, the PCF points to the testimony of Dr. Shackleton that Crane should be able to go back to managing his business (auto repair) as long as he avoided lifting, bending, or working on trucks. Dr. Shackleton further opined that Crane had no progressive neurological problems. Further, the PCF notes that the testimony of Cornelius E. Gorman, Ph.D., an expert in vocational rehabilitation, suggests that Crane could be released to perform sedentary work. PCF finally notes that several reported cases exist that suggest a lower award would be more appropriate to compensate Crane for his damages.[11]
Crane counters that the testimony offered at trial supports the award insofar as numerous witnesses testified that Crane was in significant pain, that his pain might never resolve, and that even Dr. Billings testified that Crane was "sufficiently physically impaired to preclude him from returning to regular gainful employment." Crane points out that even Dr. Shackleton admitted on cross-examination that he has never seen a patient with an eight-level fusion absent scoliosis or a fractured spine and that Dr. Rauchwerk testified that his entire lumbar spine is fused.
We note that the award of general damages is subject to an abuse of discretion standard, and that the discretion of the finder of fact is great. Pryor v. United *1035 Services Auto. Ass'n., 98-1371, p. 11 (La.App. 4 Cir. 2/10/99), 729 So.2d 658, 664. We do not find that the jury abused its discretion in awarding Crane $1,400,000.00 in general damages. Crane underwent three spinal fusions in the course of one year (including at least one that has been deemed "unnecessary") and the evidence presented at trial preponderates to show that Crane will most likely live with significant pain for the rest of his life, and that his quality of life has been greatly affected by his back pain. The testimony further establishes that his entire lumbar spine is fused.
With regard to the award for lost wages, both past and future, we similarly do not find that the jury erred. Kenneth Boudreaux, Ph.D., an economist, testified that Crane's past and future lost wages, assuming he would have worked until age 60, would be $1,241.172.00. If Crane could work until age 65, his lost wages would be $1,459,247.00. The PCF did not put on the testimony of any expert witness to contradict these calculations. Although we recognize that the PCF's position is that Crane is able to work, we accept the jury's determination that he is unable to work and find that the award for lost wages is consistent with the expert testimony presented to the jury.
For the foregoing reasons, the verdict of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Prior to the September 1990 accident, Crane underwent a two-level fusion in May 1983 after he was injured while jumping on a trampoline. Following the fusion, he worked as a mechanic in his own mechanic's shop until the automobile accident in 1990.
[2] By this time, Dr. LaRocca had retired from practice.
[3] The Cranes named as defendants Synthes, Inc., Synthes (USA), Synthes North America, Inc., and Synthes AG. The trial court subsequently dismissed the Syntheses entities as defendants.
[4] Dr. LaRocca passed away in early 1992.
[5] The PCF filed a supplemental and amending answer that alleged that Crane's damages arose from his own negligence.
[6] We note that Dr. Rauchwerk had testified at the first jury trial in February 2004 before the trial court judge declared a mistrial.
[7] Article 402 provides in pertinent part that "[e]vidence which is not relevant is not admissible." Article 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. arts. 401, 402.
[8] La. R.S. 40:1299.44 C(5)(e) provides that: "In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the trier of fact shall consider the liability of the heath care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars."
[9] We view the disputed stipulation of liability entered by the PCF as a legal non-event: the trial court did not accept the stipulation into evidence (it was proffered) and, had it been entertained, it would have had no legal effect. Dr. LaRocca's liability for all of the alleged acts of malpractice were statutorily admitted as a matter of law pursuant to R.S. 40:1299.44. Under Louisiana law, there is no legislative or jurisprudential method by which this legal reality can be altered by subsequent stipulations by the PCF. Therefore, although the Cranes argue that the stipulation "opened the door" for testimony regarding the standard of care, we do not find this argument persuasive. The proffered stipulation neither altered the legal status of Dr. LaRocca's liability in this matter, nor should it affect the burden of persuasion borne by the Cranes at trial.
[10] Beyond the initial, blanket objection, the PCF did not make any objections during Dr. Rauchwerk's testimony when he made the complained-of remarks. We find that this initial objection was sufficient to preserve this issue for appeal, given the unusual circumstances of this case.
[11] Hall v. Folger Coffee Co., 02-0920 (La.App. 4 Cir. 10/1/03), 857 So.2d 1234 ($400,000.00 in general damages where plaintiff was permanently disabled from work with constant low back pain, depression, and weight gain); Gray Ins. Co. v. Hunter, 99-0497 (La.App. 4 Cir. 9/22/99), 752 So.2d 200 ($400,000.00 in general damages where plaintiff had a caged fusion at the L4-5 and L5-S1 levels); and Frazier v. Zapata Protein USA, Inc., 02-0605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141 ($250,000.00 in general damages the lowest reasonable award for lumbar laminectomy at L3-L5 and a decompression of the nerve roots bilaterally at L4, L5 and S1, as well as lumbar anterior interbody fusion at L4-5 and L5-S1).