PITMAN, J.
[ ¶ Defendants Louisiana Patient’s Compensation Fund and Louisiana Patient’s Compensation Fund Oversight Board (collectively, the “Fund”) appeal the trial court’s granting of a judgment notwithstanding the verdict (“JNOV”) in favor of Plaintiffs Mike Moore and Robin Lynette Moore, individually and on behalf of their minor children Raimee Jo Moore, Mol-lyann E. Moore and RayLyn E. Moore (the “Moores”). For the following reasons, we reverse the judgment of the trial court and reinstate the jury’s verdict and damages award. Damages are to be calculated in accordance with this opinion.
FACTS
On February 1, 2012, the Moores filed a petition for damages against IASIS Glen- *190 wood Regional Medical Center (“Glen-wood”) and Georgia Vollmar,[1] RN (“Nurse Vollmar”), alleging that, on July 30, 2007, Mr. Moore fell from a horse and was taken to the emergency room at Glenwood because of pain in his left shoulder. After vitals were taken, Nurse Vollmar administered an injection of Dilaudid and Phener-gan to Mr. Moore while he was standing. Soon thereafter, Mr. Moore collapsed and struck his head on the tile floor. The Moores alleged that Mr. Moore received substandard care following the head trauma, which resulted in neurological consequences. They contended that the injuries and damages he sustained were caused by the sole fault and/or negligence of Glen-wood and Nurse Vollmar. They noted that Nurse Vollmar was employed by Glenwood and was working] ⅞ within the course and scope of her employment at all times relevant to this petition, so Glenwood is liable for the actions of Nurse Vollmar. They also alleged that Mr. Moore sustained serious physical injuries as a result of the negligence of Glenwood and Nurse Voll-mar, which caused past physical pain and suffering; future physical pain and suffering; past mental anguish, emotional distress and anxiety; future mental anguish, emotional distress and anxiety; loss of enjoyment of life; disability and disfigurement; past medical expenses; and future medical expenses.[2] They stated that Mr. Moore had a close and loving relationship with Mrs. Moore and their children and, therefore, contended that they are each entitled to damages for loss of consortium and mental anguish. They further noted that they filed a complaint with the Medical Review Panel.[3]
Glenwood and Nurse Vollmar filed an answer denying all the allegations, except to admit that Nurse Vollmar was employed by Glenwood and was providing care to Mr. Moore in the course and scope of her employment. They stated that Mr. Moore presented to the emergency room with a complaint of shoulder pain and received appropriate care, including an injection of Dilaudid and Phenergan for his pain. They alleged that Mr. Moore was standing at the time of the injection because he refused to sit or lie down as instructed by Nurse Vollmar. They contended that the accident and any injuries resulting therefrom were due to the fault of | aMr. Moore, his wife or some other person with whom Glenwood and Nurse Vollmar had no legal action or relationship. Therefore, they argued that the principle of comparative negligence applied. They also argued that any injuries complained of were preexisting injuries or conditions and/or were the result of subsequent, separate, superseding and intervening accidents or injuries for which they are not liable. Glenwood and Nurse Vollmar also contended that the Moores failed to mitigate their damages.
On June 12, 2013, the Moores filed a petition for approval of settlement with reservation of rights and demand against *191 the Fund. They stated that they reached a full and final settlement with Glenwood and Nurse Vollmar for the payment of $95,000, paid pursuant to the Medical Malpractice Act, with a full reservation of rights, claims and causes of action against the Fund. They also stated that the Fund is entitled to a credit of $100,000 for the settlement, but that the $100,000 credit is not sufficient compensation for the damages they suffered. Therefore, they demanded additional compensation from the Fund. They stated their intent to name the Fund as a defendant in the action and to proceed against it for damages in excess of the statutory maximum of liability for qualified health care providers.
On June 25, 2013, the Fund filed an answer to the petition for approval of settlement. It did not object to the settlement, but stated that, for the Moores to obtain any monies in excess of $100,000, they must prove both liability and causation as outlined in their complaint against Glenwood and Nurse Vollmar. It contended that it is entitled to contest liability and causation in light of the settlement of less than $100,000 and denied any | ¿liability on the part of Glenwood and Nurse Vollmar. It pled the doctrine of comparative fault and failure to mitigate damages.
On July 12, 2013, Glenwood and Nurse Vollmar filed an answer to the petition for approval of settlement. They requested that the settlement agreement with the Moores be approved, with the substitution of the Fund for Glenwood for any damages the Moores may be entitled to in excess of the statutory cap on damages applicable to Nurse Vollmar and Glenwood.
On July 24, 2013, the trial court signed a consent judgment ordering that the settlement between the Moores, Glenwood and Nurse Vollmar in the sum of $95,000 be approved with a full reservation of rights against the Fund. It ordered that all claims, actions and causes of action that the Moores may have against the Fund for additional compensation are reserved and that the Fund is entitled to a credit of $100,000 pursuant to the Medical Malpractice Act. It further ordered that all defenses as may be recognized by Louisiana law are preserved for the Fund. It also ordered that all claims against Glenwood and Nurse Vollmar are dismissed, but that those parties shall be maintained as nominal defendants solely for the purpose of providing an entity through which the Moores may proceed against the Fund. It granted the Moores leave to name the Fund as a defendant.

The Trial and Jury Verdict

A jury trial began on July 8, 2015. Mr. Moore testified that he suffers from memory problems in that he can remember things that happened prior to July 30, 2007, but he does not remember everything that has happened since his fall on that day. ’He testified about his personal history, stating that he is married to Robin and that they have three daughters—Ray-Lyn, Mollyann and Raimee Jo—and that he has a daughter, Melanie, from a] 5 previous marriage. He stated that, when his marriage with his first wife ended in the early 1990s and they fought over custody of Melanie, he began to suffer symptoms of depression. He testified that, when he was nine or ten years old, he was sexually assaulted by a family friend and that, because of this assault, he worried about his daughter being away from him. He stated that he was awarded physical custody of Melanie* but that he continued to suffer from depression. He further testified that he began to take medication for his depression, which worked “for the most part,” and that he did periodically change medications. He noted that he was referred to Solutions for outpatient treatment in January 2006. He agreed with a *192 Solutions doctor’s notes that said he reported periods of depression over 15 years, which included a depressed mood and energy, social isolation, withdrawal, decreased motivation, increased sleep, neglect of work and family, crying spells and angry spells. He stated that he never had memory problems before the accident. He reported that he felt freer and was improving after being discharged from Solutions in February 2006 because that was the first time he admitted to being sexually assaulted and because his new medication “was working great.” He noted that he felt that he “had [his] life back,” that family problems healed and that he became involved in activities, including. Cowboy Church. He admitted that, even though he had improved since being discharged from Solutions, he did have some setbacks, including spells of rage and increased anxiety.
Mr. Moore also testified about his professional history and that he graduated from high school, attended college for a few years, but did not graduate, , and then entered the workforce. He stated that, after working for several trucking companies, he started his own trucking company in 1996.1He still works at his company, but is unable to devote the same effort and attention that he did before the accident. He stated that his wife has taken on more work at the company since the accident and has to explain things to him and make excuses for him.
Mr. Moore further testified that, on the evening of July 30, 2007, he was- riding a horse at a Cowboy Church- event and was bucked off the horse, He landed on his left shoulder and did not injure any other part of his body. Because his shoulder was swollen, his wife drove him to the emergency room at Glenwood, where he was admitted at approximately 11:00 p.m. As he sat in the waiting room, he was not in significant pain because he did not move his arm. He was then taken to triage, where his pain intensity was rated a five at rest, but a nine to ten when moving. He was then taken to an exam room by wheelchair. A doctor came in the room, examined his shoulder, stated that X-rays would need to be taken and then left the room. Nurse Vollmar then entered the room and stated that she needed to give him a pain injection. He noted that he had not requested a pain injection and did not understand the-purpose of it because he was not in enough pain to need medication. He assumed that the purpose of the medication was .to manage pain if his arm needed to be moved for the X-ray. He stated that Nurse Vollmar administered the injection into his bottom and told him to rub the injection site. Because of his shoulder injury, he could not rub the injection site, so Nurse Vollmar told his wife to rub it for him. He testified that Nurse Vollmar never told him to sit down for the injection and never informed him of possible side effects he could experience due to the injection. He stated that, when Nurse Vollmar left the room, he was standing and rubbing the injection site by rocking back and forth on the edge of a counter. He stated! 7 that he began to feel “funny” and groggy and then “passed out.” The next thing he remembered was Dr. Pamela Gouth slapping him on the face and telling him to wake up. He stated that his head was pounding and he was very dizzy. Dr. Gouth sent him for a CT scan. Although he was discharged at approximately 5:00 a.m., he felt “out of it” and not coherent when he left the hospital. He stated that, in the weeks and months after the fall, he experienced dizziness and memory problems, neither of which he had experienced before the fall. He testified about the difficulties the memory problems caused with his business and noted that they triggei’ed depressive episodes. His depression affected his family and he had *193 outbursts and would “holler” at his family. He noted that not every day was a bad day and that he and his family did have fun activities like riding horses and going to the family camp to hunt and fish. He also testified that he was evaluated by several specialists, including a neuropsychologist and a neurologist. He stated that he takes medication for hypothyroidism and has been diagnosed with sleep apnea.
Prior to cross-examination, the jury viewed several videos from Mrs. Moore’s Facebook page. On cross-examination, Mr. Moore was asked about these videos, which showed him giving a speech at his company, having fun with his children, playing a video game and having a snowball fight with his family. He responded that he helps his daughters with their horses and goes duck and goose hunting with them. He noted that, since the accident, his business has grown, and he is still the company’s president.
On cross-examination, Nurse Vollmar testified that she began working at Glen-wood on June 16, 2003, and soon after passed her boards and received her registered nursing license. She stated that, on July 301s 2007, she worked in the emergency room at Glenwood, and Dr. Gouth was the attending physician. She noted that Mr. Moore waited in the waiting room for about an hour, then went to triage and then to an exam room. She testified that, when she entered the exam room, Mrs. Moore was seated in a chair and Mr. Moore was pacing. She did an assessment of Mr. Moore and determined that he was in a great deal of pain and could not move his left arm without experiencing pain. Mr. Moore had no other complaints. She testified that it is the standard of care for a nurse to perform his or her own pain assessment before administering pain medication. She spoke with Dr. Gouth about Mr. Moore’s condition, and Dr. Gouth ordered an x-ray and an injection of 2 mg of Dilaudid and 50 mg of Phenergan. She stated that the possible side effects of Dilaudid are dizziness, impaired judgment and loss of motor function; that those of Phenergan are drowsiness, agitation and loss of motor function; and that Phener-gan potentiates Dilaudid. She did not take Mr. Moore’s vitals, but relied on the vitals taken in triage before injecting him with Dilaudid and Phenergan. She told Mr. Moore that he needed to sit or lie down and he responded that he could not do so because of the pain. She stated that she told Mr. Moore that the injection could make him drowsy in 15 to 20 minutes and would start relieving his pain in 30 to 45 minutes. She admitted that she did not document in Mr. Moore’s .medical record that she éxplained the possible side effects of the injection or that he refused her instructions to sit or lie down for the injection. She testified that, when she administered the injection, Mr. Moore was standing, and he was still standing when she left the exam room. She also admitted that it was a breach of the standard of care to assume that Mr. Moore would not have a bad reaction to the injection. She stated that she later heard a commotion] 9 and returned to Mr. Moore’s room, finding him awake and alert. As she held his neck to protect his spinal column, she performed an assessment on him and found no changes. She noted that, from the time she administered the injection to when Mr. Moore fell, she did not have time to return to his room to make sure he was in a safe position before the medication made him sleepy. She admitted that, at the time of the accident, she was addicted to and abusing prescription pain medication, including Dilaudid. She would not take the medication during her work shift, but, at times, she would experience physical pain due to her dependence on the medicine. She clarified that she was never unable to complete *194 her shift because of a craving and was never distracted from her patients. She stated that, two months after the accident, she refused a drug screen at work and then entered addiction treatment, with 45 days at one facility and 60 days at another, and has been sober since completing treatment.
On direct examination, Nurse Vollmar testified that, when she was addicted to pain medication, she was still a good nurse and never received any complaints. She stated that, once she completed treatment, Glenwood offered her a raise if she returned to working there and paid for her to obtain her Master’s degree. Since June 15, 2015, she has worked for a different company. She testified that, when she treated Mr. Moore, she did not simply walk into his exam room and give him an injection. She first spoke with Dr. Gouth about Mr. Moore’s pain to expedite the process of his receiving pain relief. She noted that some events were not documented in his medical record because not every action taken with a patient is documented. She explained the routine of administering an injection, i.e., she makes sure she has the right patient and the right medicine, that it is the right time to givelm the injection and that the patient does not have allergies. She talked to Mr. Moore about when he could expect to feel the effects of the medication and that it would make him sleepy. She stated that this is why she asked him to sit and that she would be back to check on him to make sure he received adequate pain relief.
On cross-examination, Dr. Gouth testified that she is certified in family medicine and urgent care medicine and that her current practice is confined to emergency medicine. She stated that she began working at Glenwood in May or June 2007 and was on duty on July 30, 2007, when Mr. Moore presented with left shoulder pain. She noted that she first saw Mr. Moore when he was taken by wheelchair from triage to an exam room and that he was holding his arm against his body and was in obvious pain. Nurse Vollmar later came to her with a verbal report on Mr. Moore’s condition. Based on her own observation and Nurse Vollmar’s report, Dr. Gouth instructed Nurse Vollmar to give him 2 mg of Dilaudid and 50 mg of Phenergan. She explained that Dilaudid is a narcotic of the opiate class and that Phenergan was given to help alleviate any nausea that the Dilau-did and/or pain may cause. She stated that loss of consciousness, drowsiness and fainting are possible side effects of Dilaudid and that Phenergan could cause loss of coordination and drowsiness. She gave Nurse Vollmar customary orders of telling the patient not to get up and to orient him to where the call light is located or to discuss this information with a family member to help the patient and keep him from falling or getting into danger. She clarified that she was not present in the exam room, so she does not know if Nurse Vollmar followed these instructions. She stated that, if Mr. Moore refused to follow the instructions to sit or lie down, h,Nurse Vollmar should have reported that refusal to her. Nurse Vollmar did not make such a report. If Nurse Vollmar had told her that Mr. Moore refused to sit or he down, she would have instructed Nurse Vollmar not to administer the injection. She testified that she entered Mr. Moore’s exam room because she heard him fall and hit the floor. She was the first to arrive at his room. He complained of pain on the left side of his head, and she felt a contusion there. Mr. Moore did not lose consciousness. She initiated C-spine precautions by immobilizing his cervical spine and held his neck still with her hands, something that Nurse Vollmar did not do. She did not detect anything significant in his CT scan, *195 but noted that it cannot identify a concussion. She discharged Mr. Moore with head injury instructions, i.e., if he should develop a worsening headache, nausea or vomiting, change in behavior or confusion, he should return to the emergency room. She noted that she offered to admit Mr. Moore to the hospital for close observation and treatment, but he refused.
On direct examination, Dr. Gouth testified that she considered Nurse Vollmar to be an excellent nurse and the best with whom she had ever worked. Her assessments were accurate and complete, and she complied with orders. She stated that she heard a thump in Mr. Moore’s exam room and arrived within five or six seconds. Mr. Moore was talking when she arrived in the room, and she did not have to slap him to wake him up.
Christy Wyatt, RN, testified as an expert in the field of nursing, qualified to give and render opinions with regard to the standard of care that applies to registered nurses. She stated that she reviewed the records in this case and determined that Nurse Vollmar breached the standard of care. Nurses are required to instruct patients on the side effects of pain medication^ and on safety precautions to take to avoid those side effects or being injured by them. It is the standard of care for nurses to document giving those instrac-tions in the medical record. She testified that Glenwood’s policy also required nurses to document each step of the nursing process. She explained that, if something is not documented, it did not occur. She stated that it was'improper for Nurse Vollmar to rely on Mr. Moore’s prior triage pain rating because it is the standard of care for a nurse to conduct her own pain assessment. It is also the standard of care to instruct a patient that a medication will make him sleepy and to explain that the patient should lie down to prevent injury. If possible side effects are fainting and loss of coordination, telling a patient that a medication could only cause sleepiness is not sufficient. She opined that, if Nurse Vollmar advised Mr. Moore only that the medication could make him sleepy, she deviated from the standard of care. She stated that, if a patient refuses to sit for an injection, a nurse should explain why a standing position is not safe and then refuse to give the patient the injection until he complies with the instruction to sit. She further stated that Nurse Vollmar breached the standard of care by failing to ensure that Mr. Moore was in a safe position when she left him standing in the exam room after administering the injection.
Darlyne Nemeth, PhD, testified by video deposition as an expert in the field of neuropsychology. She stated that she evaluated Mr. Moore at the request of his attorney because of a concern that he may have sustained a concussion, i.e., a mild traumatic brain injury, as a result of the fall at Greenwood. She explained that a concussion is a group of symptoms that occur in the immediate aftermath of a head injury when a person hits his head and his brain rotates back and forth. The symptoms include loss or | ^clouding of memory for events preceding and following the injury, headache, neck pain, dizziness, mood changes and insomnia. The majority of persons who suffer a mild traumatic brain injury will resolve all symptoms within one year. She testified that she evaluated Mr. Moore over a three-day period in 2008, during which she conducted an extensive interview with him, and he completed detailed questionnaires. She stated that the symptoms he exhibited suggested a mild traumatic brain injury, and she planned her evaluation of him based on this information. This evaluation consisted of 23 different tests, including one that determined Mr. Moore was not malingering. She discussed his test results and noted that his *196 intellectual functioning was average, but his processing speed, verbal comprehension and perceptual organization were low average; his working memory, i.e., the ability to retain things for a few seconds, was average; he had significant problems paying attention and with impulsivity; he had variability of performance, i.e., he would perform well one day, but not the next; he had significant problems with immediate memory, i.e., the ability to retain things for a few minutes or longer; he had difficulties with delayed memory, i.e., the ability to retain things for 30 minutes; and he performed very well on a problem-solving test. She testified that her conclusions were that Mr. Moore presented with classic signs of post-concussive syndrome secondary to a mild traumatic brain injury, which she attributed to his fall at Glen-wood. She noted that Mr. Moore had depression prior to the accident and that the mild traumatic brain injury exacerbated his depression. She reevaluated Mr. Moore in 2009, noting that he had improved in some areas, including behavior and affect, but still had| ⅛ difficulties with perceptual organization, delayed memory, attention, response time, variability of performance and multitasking.
Shelly Savant, MD, testified as an expert in the fields of neurology and psychiatry, explaining that she was asked to create the life care plan, i.e., a list of medical recommendations, for Mr. Moore. She noted that she is not an advocate for Mr. Moore, but is in a neutral position. Her evaluation included interviewing him, physically examining him and reviewing his medical records to arrive at her medical recommendations. She diagnosed him with a concussion; cognitive disorder, in that he had problems with memory, attention, concentration and executive functioning; and personality disorder due to a general medical condition. She stated that, on the day of trial, Mr. Moore continued to suffer from post-concussive syndrome. She testified that her recommendations for Mr. Moore included budgeting for a financial management plan; imaging studies (e.g., MRIs or CT scans) every four years; yearly blood tests; neuropsychological testing every ten years; medications; evaluations with neurology, psychiatry and internal medicine; psychology; family therapy; one dietary assessment; a driver’s evaluation; supervised physiotherapy in a wellness program for weight loss; and vocational rehab assessment. She stated that the most expensive of her recommendations is that Mr. Moore participate in a 30-day evaluative stay at a structured brain injury facility, followed by 60 days of treatment, and that he return to the facility for four weeks of therapy each year. She provided a detailed plan and included costs for the recommendations, which totaled $2,051,866.16.[4]
1^Cornelius Gorman, PhD, testified as an expert in the fields of life care planning and medical cost analysis. He stated that he worked with Dr. Savant to create the life care plan she recommended and determined the costs for those treatments.
Zoe Meeks, CPA, testified as an expert in accounting and economic loss analysis relating to future medical care costs. She used the information from Dr. Gorman’s report to prepare her report, which stated that the economic loss related to future medical care for Mr. Moore was $3,235,562.[5]
*197 Mrs. Moore testified that their family had “a lot of rough times,” which culminated in Mr. Moore entering an outpatient program at Solutions. She stated that the Solutions program “most definitely” helped Mr. Moore in that he was more engaged, had a purpose, found more interest in family activities and became involved in Cowboy Church. She further stated that, when Mr. Moore injured his shoulder, she took him to the emergency room at Glenwood, where they sat in the waiting room until taken to triage and his vitals were taken. He was then taken to an exam room by wheelchair and she accompanied him. She testified that Nurse Vollmar entered the room and told Mr. Moore that she was going to give him an injection for the pain. She noted that Mr. Moore was not in pain when he held his injured arm up against his body, but they assumed the pain injection was for when he would have to move for X-rays. Nurse Vollmar did not give him any instructions about how he should position himself or of possible injection side effects. |inShe did instruct him to rub the injection site. She rubbed the injection site for a little while, and then Mr. Moore, who was standing, used the counter to rub it. A doctor then walked in, looked at Mr. Moore’s shoulder, said she would order testing and left the room. She testified that she was sitting on the bed in the room and had used her hat to cover her eyes when she heard a “huge slam on the floor,” and she jumped up and started screaming. Mr. Moore’s eyes had rolled back in his head. Several people came in the room and Mr. Moore was moaning and saying, “Oh, my head.” She described him as “groggy” and “out of it.” She stated that they went home early that morning. She further testified that, following the accident, Mr. Moore was very dizzy and nauseous, his personality was different and he began to have memory problems. He took out his aggravation on her and their children and she stated that this behavior was much worse than it was before he went to Solutions. She stated that they do have good times and that she shares some of those times on Facebook, but does not share the negative things. She testified that she had taken on a larger role at Mr. Moore’s company following the accident because of his memory problems and resulting frustration and embarrassment. She has to constantly remind him about things, and she feels like she is his mother. She also discussed the negative effects Mr. Moore’s accident has had on their daughters.
Shannon Wilson, Mrs. Moore’s sister, testified that she is an employee at Mr. Moore’s company and does the bookkeeping and accounting and helps Mr. Moore “with everything.” She stated that he did not have any memory problems prior to the accident, but that, since thej17 accident, he has been very forgetful and sometimes withdraws or becomes angry. She stated that the memory problems trigger his frustration.
The Moores rested their case, followed by the testimony of the Fund’s witnesses. James Eppinette, MD, testified as a physician qualified to give and render opinions related to family practice. He stated that he treated Mr. Moore prior to and after the July 2007 accident. He discussed Mr. Moore’s medical records, including his problems with fatigue, sleep apnea and weight loss. Records from November 2006 noted that he had spells of rage; records from January 2007 stated that he suffered from insomnia and increased anxiety; records from August 2007 noted that he had *198 been unable to work since the accident due to dizziness; and records from September 2007 stated that he complained of headaches, dizziness and increased depression. On cross-examination, Dr. Eppinette testified that, following the accident, he diagnosed Mr. Moore with post-concussive syndrome and stated that he would expect someone with Mr. Moore’s history of depression to have the symptoms of depression worsen due to post-concussive syndrome.
James Pinkston, PhD, MP, testified as an expert in clinical and medical neuropsy-chology. He stated that he reviewed Mr. Moore’s medical records, spoke with Mr. and Mrs. Moore and performed an evaluation on Mr. Moore. He stated that he did not find evidence of persisting cognitive problems and believed that Mr. Moore’s memory was “fine.” Mr. Moore’s auditory and immediate memory fell in the average range, his delayed memory fell in the low-average range and his processing speed was in the average range. His ultimate opinion was that it is more probable than noths that Mr. Moore’s complaints and symptoms were not related to the fall in 2007.
On July 13, 2015, the jury found that the Moores proved by a preponderance of the evidence that the care and treatment provided by Glenwood and Nurse Vollmar was below the standard of care and caused the injury to Mr. Moore that he would not otherwise have incurred. It determined that $30,000 would compensate Mr. Moore for past, present and future physical pain and suffering and that $30,000 would compensate him for past, present and future mental anguish, emotional distress and anxiety. It did not award any compensation for loss of enjoyment of life or disability. It also determined that the Moores proved by a preponderance of the evidence that Mrs. Moore and the Moore children suffered a loss of consortium. It stated that $26,000 would compensate Mrs. Moore and that $3,000 would compensate each of the three children. It further determined that the Moores proved by a preponderance of the evidence that Mr. Moore was in need of future medical care and related benefits in the amount of $175,000. In addition, it determined that the Fund proved by a preponderance of the evidence that Mr. Moore was negligent and that such negligence was a cause of any of his injuries and assigned 50 percent of negligence to Nurse Vollmar and/or Glenwood and 50 percent to Mr. Moore. It also determined that Mr. Moore incurred $23,000 in past medical expenses.
The Fund and the Moores filed a motion to tax costs. A hearing on these motions was held on September 23, 2015. The trial court found that both the general damages and the special damages should, form a part of the total award of damages by the jury, that the $100,000 credit should bej13 deducted from that amount, that the comparative fault principle should then be applied to the remaining amount and that interest should be added to that amount.
On October 2, 2015, the trial court filed a judgment awarding Mr. Moore $30,000 for past, present and future physical pain and suffering; $30,000 for past, present and future mental anguish, emotional distress and anxiety; $23,000 for past medical expenses; and $175,000 for future medical care and related benefits. It awarded Mrs. Moore $26,000 and each of the Moore children $3,000 for loss of consortium. It apportioned 50 percent of fault to Glenwood and Nurse Vollmar and 50 percent to Mr. Moore. It granted the Moores’ motion to tax costs and denied the Fund’s motion to tax costs. It cast the Fund with costs in the amount of $36,833.15. It explained that the gross damage award was $293,000; that the $100,000 settlement credit should *199 be applied to reduce the award to $193,000; and that 50 percent for comparative fault was then to be applied to reduce the net damages award to $96,500. It further stated that legal interest shall accrue and be calculated on the net damages award from July 29, 2008, i.e., the date of filing of the Medical Review Panel complaint, until paid, and that legal interest shall accrue and be calculated on the court costs award from the date of the instant judgment until paid.

Judgment Notwithstanding the Verdict

On October 16, 2015, the Moores filed a motion for JNOV, or alternatively, for new trial. They argued that the jury verdict as to damages was so internally inconsistent that the awards were impossible to reconcile and that the award of damages was woefully inadequate. They contended that the verdict as to the apportionment of fault was impossible to reconcile! m with the evidence and that the only reasonable conclusion was that the Moores were not in any way at fault for the damages they suffered. They further argued that the jury verdict constituted an abuse of discretion and requested that the trial court render a JNOV. In the alternative, they requested a new trial on the issues of damages and apportionment of fault.
In a memorandum in support of their motion, the Moores contended that the evidence at trial proved that Nurse Voll-mar breached the standard of care by incorrectly assuming that Mr. Moore would be fine when she left him standing after injecting him with a narcotic. They argued that multiple doctors testified that Mr. Moore suffered from a mild traumatic brain injury due to his fall at Glenwood and that he had post-concussive syndrome. They noted that Dr. Gorman determined that the cost of future medical care for Mr. Moore was $2,051,866.16, and that Ms. Meeks testified that the economic loss suffered by Mr. Moore was $3,235,362.
On October 16, 2015, the Fund filed a motion for JNOV, or alternatively, for new trial. It argued that the award granted to the Moores for future medical expenses was excessive. In a memorandum in support of its motion, the Fund contended that there was no basis for the excessive amount of future medical damages awarded, i.e., $175,000. It contended that the evidence at trial showed that Mr. Moore sporadically treated for his mood disorder after the fall and discontinued therapy in 2013, It noted that the Moores’ experts stated that treatment would cost only $30,592. It requested that the trial court reduce the verdict for future medical treatment from $175,000 to $0, or to $30,592.
A hearing on the motions for JNOV was held on December 21, 2015. The trial court granted the Moores’ motion for JNOV on the issue oij^ liability, stating that Nurse Vollmar was 100 percent at fault in causing the accident and that the jury erred in finding that Mr. Moore was 50 percent at fault. It denied the Moores’ motion for JNOV as to the issue of damages for future medical care and expenses. It granted the Moores’ motion for JNOV as to the issue of damages for mental anguish and emotional distress and determined that the award should be increased, explaining that Mr. Moore’s depression was properly managed through medication for 16 months prior to the accident, but that the accident aggravated his preexisting condition and brought on a new injury, i.e., the concussion, which caused further depression. It noted that Drs. Savant and Gorman developed a life care plan for Mr. Moore because Dr. Savant believed he would suffer these conditions for the rest of his life. It opined that, because the jury found that Mr. Moore was entitled to damages for future medical care, it rejected Dr. Pink- *200 ston’s testimony. It determined that, due to Mr. Moore’s suffering from a traumatic brain injury, he is entitled to $175,000 for mental anguish and distress. It denied the Fund’s motion for JNOV and new trial and determined that there is enough evidence to support the jury’s award of $175,000 for future medical expenses.
On January 13, 2016, the trial court filed a judgment denying the Fund’s motion for JNOV and granting in part and denying in part the Moores’ motion for JNOV. It granted the motion as to the issue of liability and apportioned 100 percent fault to Glenwood and Nurse Vollmar. It granted the motion as to the issue of damages for past, present and future mental anguish, emotional distress and anxiety and increased those damages to $175,000. It denied the motion as to future medical care and cast the Fund with the costs of the proceeding. It calculated the total amount of [^damages, costs and legal interest owed by the Fund to the Moores as follows:
(1) Add general damages in the amount of $240,000.00, past medical expenses in the amount of $23,000.00 and future medical care and related benefits in the amount of $175,000 to arrive at a gross damage award of $438,000.00;
(2) Apply $100,000.00 credit for the prior settlement to the gross damage award of $438,000.00 to reduce the award to $338,000.00;
(3) Legal interest shall accrue and be calculated on the net damages award in the amount of $338,000,00 from July 29, 2008, the date of filing of the Medical Review Panel complaint, until paid.
(4) Legal interest shall accrue and be calculated on the court costs award in the amount of $36,833.15 from the date of the instant Judgment, until paid.
The Fund appeals the judgment of the trial court.
DISCUSSION

Standard for JNOV

A motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues. La. C.C.P. art. 1811. In Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829 (La. 1991), the Louisiana Supreme Court set forth the standard to be used to determine whether a JNOV has been properly granted. It stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.... In making this determination, the court should not evaluate the credibility of the witnesses, andks all reasonable inferences or factual questions should be resolved in favor of the non-moving party. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or *201 not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

JNOV—Liability

In its first assignment of error, the Fund argues that the trial court erred in its application of the standard for JNOV by making credibility determinations against Nurse Vollmar and by drawing inferences in favor of the Moores based on medical records to overturn the jury’s finding of comparative fault. It contends that a reasonable jury could determine that Nurse Vollmar gave Mr. Moore sufficient warning for him to preserve his own safety and find Mr. Moore to be 50 percent at fault for his injuries for not taking those actions. In its second assignment of error, the Fund argues that the trial court erred in overturning the finding of comparative fault when it concluded that Nurse Voll-mar, by admitting a breach of the standard of care, absolved Mr. Moore of any comparative fault. It explains that, regardless of whether she breached the standard of care, Mr. Moore is still subject to a comparative fault analysis.
The Moores argue that the trial court correctly applied the JNOV standard on the issue of liability. They also argue that the only verdict that reasonable persons could have arrived at in light of the evidence presented was that Nurse Vollmar and Glenwood were solely at fault. They contend^ that Mr. Moore exercised the appropriate degree of care expected of an injured patient under the particular circumstances, especially in light of the inadequacy of the warning Nurse Vollmar claimed she gave.
We find that the trial court erred in granting the JNOV on the issue of liability. The evidence presented at trial did not point so strongly in favor of the Moores that a reasonable jury could not reach different conclusions.- The testimony of Mr. Moore, Mrs. Moore and Nurse Vollmar demonstrates that a reasonable jury could reach the conclusion it reached as to liability, i.e., that Glenwood and Nurse Vollmar were 50 percent at fault and Mr. Moore was 50 percent at fault.
Mr. Moore testified that Nurse Vollmar told him that she needed to give him a pain injection, but did not tell him to sit down after the injection and did not tell him the possible side effects of the injection. He stated that she did instruct him to rub thé injection site. Mrs, Moore testified that Nurse Vollmar did not instruct Mr. Moore as to how he should position himself or of possible side effects. Mrs. Moore noted that Nurse Vollmar did tell him to rub the injection site. Both Mr. Moore and Mrs. Moore acknowledged that, if Nurse Vollmar had given Mr. Moore an instruction to sit, or lie down, he would have obeyed that instruction.
Nurse Vollmar testified that she told Mr. Moore that she had a pain injection for him and that he needed to sit or lie down, but he responded that he could not do so. She stated:
When I gave him the shot, he was not comfortable enough to sit down- or lay down, which is considered a safe position. However, I explained to him, “This shot is going to make you sleepy. It’s going to make you drowsy. So in the next little bit we are going to have to make sure you’re at a comfort level so that we can get you in a chair or in the *202 bed. I understand you|2K cannot lay down to take the shot right now because you’re hurting too bad.” That’s not uncommon for shoulder injuries at all. It’s not uncommon for shoulder injuries to not—to not get in a comfortable position period. So he leaned over the sink or to the sink and I gave him a shot as I would anybody else that came in with a shoulder injury. Then I would have guided him to the bed or the chair. I didn’t have enough time to get back to the room to remind him, “Hey, it’s gonna make you sleepy in a few minutes.” It was barely twenty minutes later when he fell. There was not enough time for me to make sure that he was in a safe position.
Nurse Vollmar admitted that she did not document in Mr. Moore’s medical records that she told him to sit or lie down and that he refused, or that she told him the possible side effects of the medicine in the injection. She admitted that it was the standard for a nurse to document this information, but explained that there is “no way” to document everything she does with every patient.
Considering the testimony of these three witnesses, the jury was presented with differing accounts of what occurred. The apportionment of fault by the jury suggests that it accepted the testimony of Nurse Vollmar as credible and accepted her explanation that not all of the actions she routinely does as a nurse are charted in a patient’s medical record. Its apportionment of fault also suggests that it found that Mr. Moore did not follow Nurse Vollmar’s instruction. The verdict reached by the jury was reasonable based on the evidence presented at trial. The evidence did not point so strongly in favor of the Moores that a reasonable jury could not reach a different conclusion.
When granting the JNOV, the trial court clearly discounted Nurse Vollmar’s testimony and determined that actions not documented in the medical records did not occur. Although the trial court denied that it made a|2fi credibility determination on the issue of liability, it, in fact, determined that Nurse Vollmar’s testimony was not credible. Such an evaluation of credibility is inappropriate when making a JNOV determination. Therefore, the trial court erred in granting the JNOV as to liability.
Accordingly, these assignments of error have merit. We order that the verdict of the jury as to liability is reinstated.

JNOV—Damages

In its third assignment of error, the Fund argues that the trial court erroneously replaced its judgment with the jury’s by discounting Dr. Pinkston’s testimony and increasing Mr. Moore’s award for mental pain and suffering. It notes that the jury awarded $60,000 for mental and physical pain and suffering and contends that this award indicates that the jury rejected that Mr. Moore suffers both memory deficits and depression since the accident and, instead, found that there was an exacerbation of prior depressive issues, but not continuously for eight years.
The Moores argue that the jury’s general damages award is inconsistent and irreconcilable with the evidence. They contend that they presented evidence that Mr. Moore still suffers from post-concussive symptoms, including depression and memory loss. They state that the jury clearly agreed with their experts’ characterization of Mr. Moore’s injury as continuing, and not transient, in nature.
We find that the trial court erred in granting the JNOV on the issue of damages. The evidence presented at trial did not point so strongly in favor of the Moores that a reasonable jury could not reach different conclusions. The jury was *203 reasonable in its award of damages, and the damages awarded are consistent with the jury’s apportionment of fault. Both the Moores andj 27 the Fund presented expert testimony, and it appears that the jury accepted parts of the Moores’ experts’ testimony and parts of Dr. Pinkston’s testimony. It awarded $80,000 for past, present and future physical pain and suffering and $30,000 for past, present and future mental anguish, emotional distress and anxiety. It clearly did not accept the Moores’ argument that Mr. Moore was in need of millions of dollars for future medical treatment and, instead, awarded $175,000 for future medical care and related benefits. In determining its awards for damages, the jury made credibility determinations and, apparently, concluded that Mr, Moore’s injuries were not as serious or continuing as he complained. Its finding is reasonable based upon the evidence at trial, notably the different opinions of the expert witnesses as to the extent and duration of Mr. Moore’s claimed injuries and the impeachment of Mr. Moore’s credibility by the Facebook posts.
Accordingly, this assignment of error has merit. We order that the verdict of the jury as to damages is reinstated.

Calculation of Judgment

In its fourth assignment of error, the Fund argues that the trial court incorrectly calculated the judgment owed to the Moores by failing to apply the comparative fault finding first before reducing the damages by the settlement credit, causing an additional increase in the amount of judicial interest due. It explains that, by reducing the credit before apportioning comparative fault, the trial court diluted the $100,000 credit owed to the Fund to $50,000. It contends that the award due to the Moores should first be reduced by the jury’s finding that Mr. Moore was 50 percent at fault for his injuries before applying the $100,000 credit.
12sThe Moores argue that the trial court correctly calculated the amount of damages owed. They contend that the $100,000 credit is to be applied to the gross amount awarded, before any allocation of fault.
The Medical Malpractice Act caps the total amount recoverable for all malpractice claims for injuries or death to a patient at $500,000, plus interest and costs. La. R.S. 40:1231.2(B)(1).[6] It limits a qualified health care provider’s liability for the malpractice claims of any one patient to $100,000, plus interest. La. R.S. 40:1231.2(B)(2).[7] In the event that a medical malpractice claimant settles with the qualified health care provider for the $100,000 limit of liability, the claimant may then demand any excess amounts owed him or her by virtue of a judgment or settlement, subject to the $500,000 cap, from the Fund. Hall v. Brookshire Bros., 02-2404 (La. 6/27/03), 848 So.2d 559.
It is well settled that the comparative fault regime applies to liability based on medical malpractice. Miller v. LAMMICO, 07-1352 (La. 1/16/08), 973 So.2d -693, citing Dumas v. State ex rel. Dep’t of Culture, Recreation & Tourism, 02-0563 (La. *204 10/15/02), 828 So.2d 530. La. C.C. art. 2323 states in part:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to| ⅞!| the provisions of R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
La. C.C. art. 2323 does not address whether the percentage reduction for comparative fault is to be applied before or after the $100,000 settlement credit is reduced from the total award of damages. Louisiana jurisprudence has addressed when to apply comparative fault in cases where the $500,000 cap applies and found that comparative fault percentages are allocated prior to the imposition of the damages cap. See Hall v. Brookshire Bros., supra, and Miller v. LAMMICO, supra.
It appears that the question of when to apply comparative fault in a case where there is a $100,000 settlement, but the damages awarded do not exceed the $500,000 cap, is res nova before this court. Although distinguishable as a case where the $500,000 cap applied, Hall v. Brook-shire Bros., supra, provides this court with guidance. In Hall v. Brookshire Bros., the Louisiana Supreme Court determined that the trial court correctly calculated the award for damages. The Court described the calculation as follows:
First, the court reduced the total amounts awarded by the jury for pain and suffering, loss of enjoyment of life, disability, loss of consortium, and loss of earning capacity by 15%, reflecting the apportioned fault of Mrs. Hall and Mr. Vines. Because the remaining amount of damages exceeded the statutory cap, the district court reduced the award to $400,000.00 (after deducting $100,000.00 for the settlement with Dr. Seale). The court then reduced the award for past medical expenses by 15% and added! an that amount to the $400,000.00. The resulting judgment was for the full sum of $429,963.72, together with legal interest thereon from date of judicial demand (May 31, 1996) until paid. The judgment also declared Mrs, Hall to be a patient in need of future medical care and related benefits. The judgment did not include interest on the $100,000.00 received in settlement.
The Court explained:
[W]hen a verdict is reduced by comparative fault before the cap of LSA-R.S. 40:1299.42(B)(1) [now, La. R.S. 40:1231.2(B)(1)] is applied, there is no risk that the plaintiff will recover damages that the jury found were caused by him or her. By definition, as long as the entire verdict is reduced by the plaintiffs comparative fault, there is no chance that the plaintiff will recover damages which the fact-finder determined he or she caused. The purpose of comparative fault remains intact. Likewise, there is no risk that, contrary to *205 the provisions of LSA-R.S. 40:1299.41(1) [now, La. R.S. 1231.1(1)], the Fund will be made responsible for any sums except those arising from the medical malpractice.
We find that in eases like the case sub judice, where the claimant settled with the qualified health care provider for $100,000, comparative fault was allocated and the damages awarded do not exceed the statutory damages cap, comparative fault percentages shall be allocated before the imposition of the settlement credit. By calculating damages in this order, there is no risk that the claimant will recover damages that the jury found were caused by him. Further, this calculation follows the calculation set forth in Hall v. Brookshire Bros,, supra, where comparative fault was allocated before the settlement credit was imposed.
Therefore, we calculate the Moores’ damages award as follows:
(1) Add general damages in the amount of $95,000, past medical expenses in the amount of $23,000 and future medical care and related benefits in the amount of $175,000 to arrive at a gross damages award of $293,000;
(2) Allocate Mr. Moore’s comparative fault percentage of 50 percent to reduce the award to $146,500; and
|m(3) Apply the $100,000 credit for the prior settlement to reduce the award to $46,500.
Legal interest shall be calculated on the net damages award in the amount of $46,500 from July 29, 2008, i.e., the date of filing of the Medical Review Panel complaint, until paid.
Accordingly, this assignment of error has merit. Damages shall be calculated in accordance with this opinion.
CONCLUSION
For the foregoing reasons, we reverse the trial court’s granting of a JNOV in favor of Plaintiffs-Appellees Mike Moore and Robin Lynette Moore, individually and on behalf of their minor children Raimee Jo Moore, Mollyann E. Moore and Ray-Lyn E. Moore and against Defendants-Appellants the Louisiana Patient’s Compensation Fund and Louisiana Patient’s Compensation Fund Oversight Board. We reinstate the jury’s verdict and damages award. Damages are to be calculated in accordance with this opinion. Costs of this appeal are assessed to Plaintiffs-Appel-lees, Mike Moore and Robin Lynette Moore.
TRIAL COURT’S JUDGMENT REVERSED. JURY VERDICT AND DAMAGES AWARD REINSTATED. DAMAGES AWARD TO BE CALCULATED IN ACCORDANCE WITH THIS OPINION.

. In the record, Nurse Vollmar’s last name is spelled ''Volmar” and "Vollmar,” and she is also referred to as "Georgia Pope” and "Georgia Turner.”

. The Moores also alleged that Mr. Moore suffered lost wages, loss of earning capacity and lost profits, but they dismissed these claims with prejudice on July 8, 2015.

. On December 6, 2011, the Medical Review Panel rendered an opinion that there was a material issue of fact bearing on liability regarding Glenwood and Nurse Vollmar, i.e., what instructions, if any, were given by Nurse Vollmar to Mr. Moore in connection with the injection that she administered to Mr. Moore. The Medical Review Panel determined that Nurse Vollmar did not deviate below the standard of care by not having come back to the exam room in the 21 minutes between the administration of the injection and the time Mr. Moore fell.

. This total included $1,530,000 for facility care; $338,400 for financial management; $57,098 for future medical care routine; $19,123 for health and strength maintenance; $37,400 for home care; $19,518.16 for medications; $19,735 for projected evaluations; and $30,592 for projected therapeutic modalities.

. This total included $2,678,956 for facility care; $82,338 for routine medical care; *197 $14,155 for health and strength maintenance; $34,188 for home care; $20,059 for medications; $20,360 for evaluations; $32,757 for therapeutic modalities; and $352,549 for financial management.

. House Concurrent Resolution No. 84 of the 2015 Regular Session authorized and directed the Louisiana State Law Institute to reorganize and recodify the "Miscellaneous Health Provisions” Chapter of Title 40 of the Louisiana Revised Statutes of 1950. Accordingly, La. R.S. 40:1299.41 through 1299.49 were redesignated as La. R.S. 40:1231.1 through 1231.10. Although the record in this case refers to the former statutes, we refer herein to the current statutes but make note of the former statutes.
La. R.S. 40:1231.2(B)(1) was previously La. R.S. 40:1299.42(B)(1).

. La. R.S. 40:1231.2(B)(2) was previously La. R.S. 40:1299.42(B)(2).